STATE of Tennessee, DEPARTMENT OF HUMAN SERVICES,

v.

Mary C. NORTHERN.

Court of Appeals of Tennessee, Middle Section.

Feb. 7, 1978.

Certiorari Denied by Supreme Court March 14, 1978.

William B. Hubbard, Patricia J. Cottrell, Asst. Attys. Gen., Gregory M. Galloway, Nashville, for State of Tennessee.

Carol L. McCoy, Nashville, for Guardian Ad Litem.

Ames Davis, Nashville, for amicus curiae.

TODD, Judge.

## OPINION

This is a proceeding under Chapter 23, Title 14, T.C.A. entitled "Protective Services for Elderly Persons."

Section 14–2301 declares:

"*14–2301. Legislative intent and purpose.*—It shall be the responsibility of the state of Tennessee to develop and to encourage the provision of protective services for elderly persons residing in the state in need of such services. [Acts 1974 (Adj.S.), ch. 730, § 1.]"

Section 14–2302 defines certain terms, and includes the following:

"(b) The words 'elderly person in need of protective services' shall mean any elderly person unable to perform or obtain for himself services which are necessary to maintain his mental and physical health.

(c) The words 'services which are necessary to maintain mental and physical health' shall include, but shall not be limited to the provision of medical care for physical and mental health needs, assistance in personal hygiene, food, clothing, adequately heated and ventilated shelter, protection from health and safety hazards, foster care, day care, protection from physical mistreatment, and transportation necessary to secure any of the above-stated needs; provided that the words 'services which are necessary to maintain mental and physical health' shall not include taking the elderly person into physical custody without his consent, except as provided in § 14–2306 and in title 33 of this Code.

(d) The words 'protective services' shall mean services which are necessary to maintain mental and physical health and which an elderly person is unable to perform or obtain for himself."

Sections 14–2303 and 2304 provide for reporting needy elderly persons and duty of the State Department of Human Services upon receipt of such report.

Section 14–2305 provides for furnishing protective services to *consenting* elderly persons and concludes as follows:

"(c) If an elderly person does not consent to the receipt of protective services, or if he withdraws his consent, the services shall be terminated, unless the de-

partment determines that the elderly person lacks capacity to consent, in which case it may seek court authorization to provide protective services pursuant to § 14–2306. [Acts 1974 (Adj.S.), ch. 730, § 1.]"

Section 14–2306(a) provides:

"If the department determines that an elderly person who is in need of protective services is in imminent danger of death if he does not receive protective services and lacks capacity to consent to protective services, then the department may file a complaint with the chancery court for an order authorizing the provision of protective services necessary to prevent imminent death. The chancellor shall hear the complaint ahead of any other business then pending in court or in chambers. This order, may include the designation of an individual or organization to be responsible for the personal welfare of the elderly person and for consenting to protective services in his behalf. The complaint must allege specific facts sufficient to show that the elderly person is in imminent danger of death if he does not receive protective services and lacks capacity to consent to protective services.

"The chancellor, prior to entering the order, must find that the elderly person is in imminent danger of death if he does not receive protective services and lacks capacity to consent to protective services.

"Within five (5) days of entering an order pursuant to this section, the court shall hold a hearing on the merits. If such a hearing is not held within such time, the order authorizing the provision of protective services shall be dissolved.

"The elderly person must receive at least forty-eight (48) hours notice of the hearing. He has a right to be present and represented by counsel at the hearing. If the elderly person is indigent, or in the determination of the chancellor, lacks capacity to waive the right to counsel, then the court shall appoint counsel. If the elderly person is indigent, the cost of representation by counsel shall be borne by the state.

"At this hearing, the chancellor may find that the elderly person is in imminent danger of death if he does not receive protective services and lacks capacity to consent to protective services. If the chancellor finds that the elderly person is not in imminent danger of death if he does not receive protective services or that the elderly person does not lack capacity to consent to protective services, then the original order shall be dissolved.

"Protective services necessary to prevent imminent death authorized by order pursuant to this section may include taking the elderly person into physical custody in the home or in a medical or nursing care facility, provided that the court finds that such custody is for the purpose of medical examination and treatment necessary to prevent imminent death or protection from physical mistreatment necessary to prevent imminent death and provided that the court specifically authorizes such custody in its order. If the court authorizes such custody in its order, the court shall review its decree at least every six (6) months to determine whether the prerequisites for custody continue to exist."

On January 24, 1978, the Tennessee Department of Human Services filed this suit alleging that Mary C. Northern was 72 years old, with no available help from relatives; that Miss Northern resided alone under unsatisfactory conditions as a result of which she had been admitted to and was a patient in Nashville General Hospital; that the patient suffered from gangrene of both feet which required the removal of her feet to save her life; that the patient lacked the capacity to appreciate her condition or to consent to necessary surgery.

Attached to the complaint are identical letters from Drs. Amos D. Tackett and R. Benton Adkins which read as follows:

"Mrs. Mary Northern is a patient under our care at Nashville General Hospital. She has gangrene of both feet probably secondary to frost bite and then thermal burning of the feet. She has developed

infection along with the gangrene of her feet. This is placing her life in danger. Mrs. Northern does not understand the severity or consequences of her disease process and does not appear to understand that failure to amputate the feet at this time would probably result in her death. It is our recommendation as the physicians in charge of her case, that she undergo amputation of both feet as soon as possible."

On January 24, 1978, the Chancellor appointed a guardian ad litem to defend the cause and to receive service of process pursuant to Rule 4.04(2) T.R.C.P.

On January 25, 1978, the guardian ad litem answered as follows:

"The Respondent, by and through her guardian ad litem, states as follows:

1. She is 72 years of age and a resident of Davidson County, Tennessee.

2. She is presently in the intensive care unit of General Hospital, Nashville, Tennessee, because of gangrenous condition in her two feet.

3. She feels very strongly that her present physical condition is improving, and that she will recover without the necessity of surgery.

4. She is in possession of a good memory and recall, responds accurately to questions asked her, is coherent and intelligent in her conversation and is of sound mind.

5. She is aware that the Tennessee Department of Human Services has filed this complaint, knows the nature of the complaint, and does not wish for her feet to be amputated.

6. There is no psychiatric report of her mental capacity, and there is nothing in the hospital or court record to support the statement that she lacks the capacity to realize the need for protective services.

7. The Court should not grant the relief sought by the Department of Human Services until a psychiatric report of the Respondent's present mental state has been made a part of this record, and the Court finds that the Respondent lacks the mental capacity to consent to medical treatment.

8. The Court is without jurisdiction to grant the relief to award physical custody of the respondent to the Department of Human Services absent a finding that the Respondent is guilty of a crime, or absent a finding that the Respondent lacks sufficient mental capacity in accordance with T.C.A. 33–501 et seq., (Mentally Retarded Person), and/or T.C.A. 33–601 et seq., (Mentally Ill Person).

9. The relief sought by the Department of Human Services should be denied.

10. In the event that the court deems it proper to grant the relief sought, the appointment should be limited to allow the Department of Human Services only to consent to the operation and necessary medical care.

11. Although over fourteen years of age and mentally competent, the Respondent is not physically capable of signing this Answer, and the guardian ad litem signs on her behalf."

On January 25, 1978, the Chancellor entered an order containing the following:

"This cause came on to be heard on the 25th day of January 1978, before the Honorable C. Allen High, Chancellor of Part II of the Chancery Court of Davidson County, Tennessee, upon the complaint filed by the Department of Human Services, the order of the Court appointing a guardian ad litem for Mary C. Northern, and upon the entire record, from all of which the Court is of the opinion that given the circumstances under which Mary C. Northern was found, the testimony of Charles Burch and Marie Hinkle, the statements of two physicians, the age of Mrs. Northern, the lack of relatives willing to act in her best interest, and her present physical condition, the Court is of the opinion that Mary C. Northern is indigent and is imminent (sic) danger of death if she does not receive the protective services of the Department of Human Services and she lacks the capacity to consent to said protective services, therefore the Court finds

204

that the Department of Human Services should be designated responsible for the personal welfare of Mary C. Northern.

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that:

1. Mary C. Northern is in imminent danger of death if she does not receive protective services and lacks the capacity to consent to protective services;

2. That the State of Tennessee, Department of Human Services, be and the same is hereby designated responsible for the personal welfare of the Respondent and for consenting to protective services in her behalf including taking the Respondent into physical custody and custody and consenting to any necessary medical treatment."

On the same date, January 25, 1978, at 4:00 P.M., the Chancellor entered a further order staying the effectiveness of the preceding order until further order of Court.

On January 26, 1978, there was filed in this cause a letter from Dr. John J. Griffin, reporting that he found the patient to be generally lucid and sane, but concluding:

"Nonetheless, I believe that she is functioning on a psychotic level with respect to ideas concerning her gangrenous feet. She tends to believe that her feet are black because of soot or dirt. She does not believe her physicians about the serious infection. There is an adamant belief that her feet will heal without surgery, and she refused to even consider the possibility that amputation is necessary to save her life. There is no desire to die, yet her judgment concerning recovery is markedly impaired. If she appreciated the seriousness of her condition, heard her physicians' opinions, and concluded against an operation, then I would believe she understood and could decide for herself. But my impression is that she does not appreciate the dangers to her life. I conclude that she is incompetent to decide this issue. A corollary to this denial is seen in her unwillingness to consider any future plans. Here again I believe she was utilizing a psychotic mechanism of denial.

"This is a schizoid woman who has been urged by everyone to have surgery. Having been self-sufficient previously (albeit a marginal adjustment), she is continuing to decide alone. The risks with surgery are great and her lifestyle has been permanently disrupted. If she has surgery there is a tremendous danger for physical and psychological complications. The chances for a post-operative psychosis are immense, yet the surgeons believe an operation is necessary to save her life. I would advise delaying surgery (if feasible) for a few days in order to attempt some work for strengthening her psychologically. Even if she does not consent to the operation after that time, however, I believe she is incompetent to make the decision."

On January 26, 1978, the Chancellor entered a further order vacating the stay of the first order and reinstating the previous (first) order, and providing further:

". . . The court requested that the guardian ad litem contact the head surgeon and delay surgery as recommended by Dr. Griffin.

.    .    .    .    .

"It is further ORDERED that the oral motion of the guardian ad litem to modify the original order be granted and reserved for later hearing.

"It is further ORDERED that the Department of Human Services compensate Dr. Griffin for his services rendered in this cause within a reasonable period of time."

On January 27, 1978, the guardian ad litem moved for a new trial and stay of previous orders on grounds of unconstitutionality of Title 14, Chapter 23, T.C.A. and a number of other grounds.

On January 27, 1978, the Chancellor entered a decree overruling the motion for new trial and stay and reciting:

"The Chancellor announced at the final hearing on the merits that he found the respondent incompetent and that he was acting not only pursuant to the jurisdic-

tion granted by T.C.A. § 14–2306 but also pursuant to Chancery jurisdiction of incompetent persons.

.    .    .    .    .

"From the orders of the Court in granting custody of the respondent to the State of Tennessee, in dissolving the temporary restraining order, and overruling her motion for new trial and for stay pending appeal, the respondent respectfully excepted and prayed an appeal to the Court of Appeals of Tennessee, which appeal is granted, provided that the appeal shall not act as a stay of the prior order of the Court."

On January 27, 1978, the guardian ad litem presented to a member of this Court a petition for supersedeas which was not accompanied by a certified record as required by the Rules of this Court. The application for supersedeas was recessed until January 28, 1978, at 9 A.M.

On January 28, 1978, a certified transcript was filed, and two members of this Court heard argument on behalf of the parties and on behalf of a proposed amicus curiae, after which it was announced that this Court would act under § 27–327 T.C.A. to investigate the facts.

On the same date two members of this Court heard testimony of the three doctors previously mentioned and visited the patient in the intensive care unit of the hospital. Said testimony and the conversation with the patient were preserved by bill of exceptions filed with the Clerk of this Court.

On the same date, January 28, 1978, this Court entered an order reciting the following:

"From all of the above the Court Finds:

1. That the respondent is not now in 'imminent danger of death' in the extreme sense of the words, but that her present condition is such that 'imminent danger of death' may reasonably be expected during her continued hospitalization.

2. That both feet of respondent are severely necrotic and affected by wet gangrene, an infection which probably will result in death unless properly treated by amputation of the feet.

3. That the probability of respondent's survival without amputation is from 5% to 10%; and the probability of survival after amputation is about 50%, with possible severe psychotic results.

4. That, with or without amputation, the prognosis of respondent's condition is poor.

5. That respondent is an intelligent, lucid, communicative and articulate individual who does not accept the fact of the serious condition of her feet and is unwilling to discuss the seriousness of such condition or its fatal potentiality.

6. That, because of her inability or unwillingness to recognize the actual condition of her feet which is clearly observable by her, she is incompetent to make a rational decision as to the amputation of her feet.

7. That respondent has no wish to die, but is unable or unwilling to recognize an obvious condition which will probably result in her death if untreated.

"This Court is therefore of the opinion that a responsible individual should be named with authority to consent to amputation of respondent's feet when urgently recommended in writing by respondent's physicians because of the development of (symptoms) indicating an emergency and severe imminence of death.

"It is therefore Ordered that the order of the Chancellor is modified to delete therefrom the words, 'and consenting to any necessary medical treatment' and to add thereto the following provision:

"The Hon. Horace Bass, Commissioner of the Department of Human Services of the State of Tennessee, or his successor in said office is hereby designated and authorized to act for and on behalf of respondent in consenting to the amputation of respondent's feet at any time that Drs. Amos D. Tackett and R. Benton Adkins join in signing a written certificate that

respondent's condition has developed to such a critical stage as to demand immediate amputation to save her life.

"To the extent indicated, the writ of supersedeas is granted and the order of the Chancellor is so modified. In all other respects, the petition for writ of supersedeas is denied."

The first assignment of error asserts that Title 14, Chapter 23, T.C.A. is unconstitutional.

■ Even if the original enactment of the statute were invalid because of insufficient caption, this was cured by subsequent re-enactment when incorporated into the Code. *Doughty v. Hammond*, 207 Tenn. 545, 555, 341 S.W.2d 713 (1960).

■ Appellant challenges the constitutionality of the provision of the statute authorizing ex parte preliminary orders without hearing. No action of the Chancellor taken without a hearing has been implemented, and all actions by this Court have occurred after full hearing. Therefore it would seem unnecessary for this Court to rule upon the validity of such provision in this case. However, in the view of this Court, the statute properly and constitutionally recognizes and utilizes the inherent power of a court of equity to act in a preliminary, ex parte, manner to preserve the status quo and integrity of the subject matter of the suit. That is, in emergency cases, where there is inadequate time to give notice and hold a hearing, a Chancellor may, by preliminary order, take necessary measures to preserve and protect the subject matter of the suit until notice can be given and a hearing held. This power is to be exercised with caution and restraint, and is not to be utilized to the injury of the parties or to create new or irreversible conditions. Said equity power of preliminary action may be properly exercised under § 14–2306(a) in authorizing and providing for the elderly person such protection and services the lack of which has produced the imminence of death. Such protection and services were afforded the patient prior to this suit without an order of court.

Affirmative steps producing an injury or irreversible condition (such as amputation) would not lie within the inherent powers of equity for preliminary relief, hence would not be authorized under § 14–2306(a) without due notice and hearing.

The disposition of this appeal by this Court is considered to be in conformity with the foregoing principles.

■ The application of the statute only to persons over 60 years of age is not per se an unconstitutional discrimination. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

In 44 C.J.S. Insane Persons § 3, pp. 48, 49 is found the following text supported by many authorities:

"Power with respect to the care and custody of persons of unsound mind and the possession and control of their estates are vested in the state, or the people thereof, the exercise of which power the people may delegate to the courts by constitutional or statutory provision. Insane persons are considered as wards of the state; and the state as parens patriae is under a special duty to protect them and their property as a class incapable of protecting themselves, . . . "

■ Title 14, Chapter 23, T.C.A. is a valid exercise of legislative authority of the sovereign State of Tennessee in providing protection for its incompetent citizens.

■ Also in respect to the first assignment, the brief of appellant states:

"Such actions by the Court were injurious to the appellant because they deprived her of her right to make her own decisions—regardless as to whether death might be a probable consequence—as to whether she was willing to surrender control of her own person and life."

This controversy arises from the fact that Miss Northern's attending physicians have determined that all of the soft tissue of her feet has been killed by frostbite, that said dead tissue has become infected with gangrene and that the feet must be removed to prevent loss of life from spreading of gan-

grene and its effects to the entire body. Miss Northern has refused to consent to the surgery.

The physicians have determined, and the Chancellor and this Court have found, that Miss Northern's life is critically endangered; that she is mentally incapable of comprehending the facts which constitute that danger; and that she is, to that extent, incompetent, thereby justifying State action to preserve her life.

As will be observed from the bill of exceptions, a member of this Court asked Miss Northern if she would prefer to die rather than lose her feet, and her answer was "possibly." This is the most definitive expression of her desires in this record.

The patient has *not* expressed a desire to die. She evidences a strong desire to live and an equally strong desire to keep her dead feet. She refuses to make a choice.

■ If the patient would assume and exercise her rightful control over her own destiny by stating that she prefers death to the loss of her feet, her wish would be respected. The doctors so testified; this Court so informed her; and this Court here and now reiterates its commitment to this principle.

For the reasons just stated, this is *not* a "right to die" case.

■ By her second assignment of error, appellant insists that she is being deprived of limb without due process as guaranteed by Article 1, Sec. 17 of the Tennessee Constitution.

Due process in respect to aged persons unable to consent is outlined in § 14–2306, supra, which contains adequate safeguards assuring due process.

Whatever the propriety or validity of the proceedings before the Chancellor and the actions taken by him, the proceedings followed by this Court have cured any deficiency in previous proceedings.

This Court is unaware of any violation of this section in the proceedings summarized above, and appellant's brief fails to point out such.

The second assignment of error is respectfully overruled.

■ The third assignment of error is as follows:

"3. The learned Chancellor erred in finding that respondent 'is in imminent danger of death if she does not receive protective services,' 'protective services' being a euphemism for action which includes submission to such surgery as the state and physicians may believe essential even though the citizen objects to such surgery, is not supported by any admissible evidence, the only evidence in the record being opinion testimony of laymen not professionally competent to reach such a decision and mere identical letters signed by surgeons who did not appear and testify and were not subjected to cross-examination, and whose letters did not even endeavor to explicate in detail the varieties of medical treatment which might be indicated, the reasons for choosing amputation as the only possible successful mode of treatment, or the degree of imminence of death and the length of time that surgery might be delayed and still be performed soon enough to avoid death; nor did their assertion in identical letters that the failure to amputate 'would probably result in her death' even indicate the degree of probability so as to permit *anyone* to make a rational decision in the matter."

Whatever the infirmities, if any, of the proceedings before the Chancellor and/or defects in his order, same have been corrected, supplied and rendered harmless by the action of this Court in modifying his decree heretofore on application for supersedeas.

The third assignment of error is respectfully overruled.

■ The fourth and fifth assignments of error are as follows:

"4. The learned Chancellor erred by entering an order effectively authorizing appellant's injury after proceedings which denied appellant the effective representation of counsel as required both by

the statute under which the Chancellor acted and by the principles of due process of law, because the guardian ad litem appointed by the Chancellor had inadequate time of acquaint herself with the facts or the law or otherwise properly to prepare for the hearings."

"5. The learned Chancellor erred in depriving the appellant of her liberty and control of her person without due process of law because neither appellant nor her guardian ad litem was given 48 hours notice of the hearing as required by the statute under which the proceedings were commenced."

Even though the patient and her guardian ad litem may not have received the 48 hours notice prior to the hearing before the Chancellor, they obtained a re-hearing before this Court which satisfies the requirement of the statute. That is, at the time of the hearing before this Court on January 28, 1978, more than 48 hours had elapsed from the original appointment of the guardian ad litem and her visit with the patient.

No action was taken affecting the patient under the order of the Chancellor.

The fourth and fifth assignments of error are respectfully overruled.

The sixth assignment of error raises the question of the sufficiency of evidence on the issue of capacity to consent.

Any alleged insufficiency of evidence has been adequately supplied by the hearing before this Court on January 28, 1978. Any alleged insufficiency in interrogation of the patient by the psychiatrist was supplied by the testimony of the psychiatrist before this Court on January 28, 1978 and the interview of the patient conducted by judges of this Court and preserved as part of the record of proceedings on January 28, 1978.

This Court is satisfied from the testimony and from its own examination of the patient, both orally and visually, that the evidence is adequate in the challenged respects.

The sixth assignment of error is respectfully overruled.

The seventh assignment is as follows:

"7. Assuming, without conceding, that the Chancellor had jurisdiction to appoint someone to make a decision on behalf of Mrs. Northern, he nevertheless erred in appointing a government department rather than a responsible individual capable of discipline for improper exercise of his fiduciary duties, and in failing to require that such guardian or quasi-guardian post a bond in some amount commensurate with the seriousness of the case, which should be no less than $100,000."

Whatever error, if any, may have occurred in the designation of a State Department was corrected when the Chancellor's order was modified to designate an individual. As to the demand for bond, such is not mentioned in the statute and is therefore not obligatory. This Court, acting within its inherent discretion declined to and does now decline to require a bond of the individual designated to give consent.

The statute authorizes the designation of "an individual or organization to be responsible for the personal welfare of the elderly person and for consenting to protective services." This Court does recognize the problems incident to designation of a governmental department or other agency rather than an individual to administer or execute the order of court in respect to certain matters. In respect to other matters such problems would not appear.

An organization might properly be designated to provide or make available the necessities of the elderly person. However, where the fiduciary function involves decision making on behalf of or control of the elderly person, it would be more appropriate to designate a particular individual to assure direct and specific responsibility and accountability.

The seventh assignment of error is respectfully overruled.

The foregoing are all of the assignments of error originally filed by appellant.

The appellant has filed three supplemental assignments of error, of which the first is:

"1. The statute, T.C.A. §§ 14–2301, *et seq.*, is impermissibly vague; and, therefore, void and unconstitutional. The two phrases used in the statute, 'imminent danger of death' and 'capacity to consent' have not been defined in the statute nor is the Court given any assistance to determine when either standard has been met in the legal context, rather than a medical context."

In· the judgment of this Court, the words "imminent danger of death" are no more vague than is consistent with the nature of the subject matter.

Death itself is a word of vague meaning. Courts and legislative assemblies as well as physicians have struggled in vain to produce an acceptable definition.

For the purposes of the statute under consideration, "death" means the termination of life by the cessation of the usual life processes.

Danger is a word of many degrees. It may imply strong or weak probability or mere possibility, according to the context of circumstances.

Imminent means close in point of time, but closeness is likewise a term of many degrees, according to the circumstances.

The words, "imminent danger of death" mean conditions calculated to and capable of producing within a short period of time a reasonably strong probability of resultant cessation of life if such conditions are not removed or alleviated. Such is undoubtedly the legislative intent of the words.

"Imminent danger of death" should be reasonably interpreted to carry out the purposes of the statute. For an authorization to mildly encroach upon the freedom of the individual, a relatively mild imminence or danger of death may suffice. On the other hand, the authorization of a drastic encroachment upon personal freedom and bodily integrity would require a correspondingly severe imminence of death.

In the present case, the Chancellor was not called upon to act until the imminence of death was moderately severe. By the time of the hearing before this Court, the imminence of death had lessened somewhat but remained real and appreciable. Accordingly this Court, recognizing a present real and appreciable imminence of death, made provision for drastic emergency measures to be taken only in event of severe and urgent imminence of death.

Appellant also complains of vagueness of the meaning of "capacity to consent." Capacity means mental ability to make a rational decision, which includes the ability to perceive, appreciate all relevant facts and to reach a rational judgment upon such facts.

Capacity is not necessarily synonymous with sanity. A blind person may be perfectly capable of observing the shape of small articles by handling them, but not capable of observing the shape of a cloud in the sky.

A person may have "capacity" as to some matters and may lack "capacity" as to others.

In 44 C.J.S. Insane Persons § 2, pp. 17, 18, partial insanity is defined as follows:

"*Partial insanity.* Although it is hard to define the invisible line that divides perfect and partial insanity, the law recognizes a state of mind called 'partial insanity,' that is, insanity on a particular subject only, sometimes denominating it 'insane delusion' or 'monomania.' The use of the term, however, has been criticized. Partial insanity has been said to be the derangement of one or more of the faculties of the mind which prevents freedom of action. Ordinarily it is confined to a particular subject, the person being sane on every other. The degree of insanity, as partial or total, is to be measured by the extent and number of the delusions existing in the mind of the person in question. . . . "

In the present case, this Court has found the patient to be lucid and apparently of sound mind generally. However, on the subjects of death and amputation of her feet, her comprehension is blocked, blinded or dimmed to the extent that she is incapa-

ble of recognizing facts which would be obvious to a person of normal perception.

For example, in the presence of this Court, the patient looked at her feet and refused to recognize the obvious fact that the flesh was dead, black, shriveled, rotting and stinking.

The record also discloses that the patient refuses to consider the eventuality of death which is or ought to be obvious in the face of such dire bodily deterioration.

As described by the doctors and observed by this Court, the patient wants to live and keep her dead feet, too, and refuses to consider the impossibility of such a desire. In order to avoid the unpleasant experience of facing death and/or loss of feet, her mind or emotions have resorted to the device of denying the unpleasant reality so that, to the patient, the unpleasant reality does not exist. This is the "delusion" which renders the patient incapable of making a rational decision as to whether to undergo surgery to save her life or to forego surgery and forfeit her life.

The physicians speak of probabilities of death without amputation as 90 to 95% and the probability of death with surgery as 50–50 (1 in 2). Such probabilities are not facts, but the existence and expression of such opinions are facts which the patient is unwilling or unable to recognize or discuss.

If, as repeatedly stated, this patient could and would give evidence of a comprehension of the facts of her condition and could and would express her unequivocal desire in the face of such comprehended facts, then her decision, however unreasonable to others, would be accepted and honored by the Courts and by her doctors. The difficulty is that she cannot or will not comprehend the facts.

The first supplemental assignment of error is respectfully overruled.

■ The second supplemental assignment of error is as follows:

"2. The Chancellor erred by denying the Appellant her rights to substantive and procedural due process. The entire legal proceedings involved in this case

and on appeal are unprecedented; the order of the Chancellor granting the appeal but refusing the automatic stay of thirty days allowed by the Rules is one example of the procedural wrongs which was not in accordance with the established legal practice, and contrary to the expected procedure to be followed. The proposed amputation will not only permanently deprive the Appellant of her two limbs, but most likely will significantly and irreparably alter her personality for the worse, and make her mentally and physically dependent upon the State."

Whatever the propriety or impropriety of the action of the Chancellor in attempting to effectuate his action in spite of the appeal, the error, if any, has been rendered harmless by the action of this Court, after appeal, in reviewing and modifying his actions.

■ This Court does not recognize that it has been guilty of any improper deviation from correct procedure. The gravity of the condition of the patient and the resultant emergency in time required the unusual action of the Court under § 27–327 T.C.A. and the unusual acceleration of hearings and actions taken.

This Court is painfully and acutely aware of the possible tragic results of amputation. According to the doctors, the patient has only a 50% chance of surviving the surgery; and, if she survives, she will never be able to walk and may suffer severe mental and emotional problems.

On the other hand, the doctors testified, and this Court finds, that the patient's chances of survival without amputation are from 5% to 10%—a rather remote and fragile chance. Moreover, as testified by the doctors and found by this Court, even if the patient should survive without amputation, she will never walk because the dead flesh will fall off the bones of her feet leaving only bare bones.

The second supplemental assignment of error is respectfully overruled.

The third supplemental assignment of error is as follows:

"3. The Chancellor acted without jurisdiction because the equitable powers of the Chancellor regarding incompetents was proscribed with the passage of the Mental Health Act, T.C.A. § 33–301, *et seq.*, which sets out the specific constitutional requirements to be afforded an individual before he or she can be declared mentally ill or incompetent. The purpose of that Act was to set out procedures and standards in dealing with the mentally ill and to limit the powers of the Chancellor as set out in the statute. That statute was never followed in any of the proceedings below."

T.C.A. § 33–301 *et seq.*, is the Mental Health Law of Tennessee, enacted in 1965, and subsequently amended in various respects. Appellant does not specify which of the many sections of said law are alleged to be applicable to this case, nor does appellant explain in detail wherein the actions of the Chancellor and of this Court were inconsistent with such law.

Instead, appellant devotes argument to citation of authorities and discussion of broad principles of the rights of individuals and incompetents.

▆▆▆ Title 14, Chapter 23, T.C.A., authorizing this proceeding was passed in 1974, nine years after the Mental Health Act. It may properly be considered an amendment of or addition to the Mental Health Law or in pari materia therewith.

Appellant's argument ignores the fact that this proceeding was begun *after* the patient was removed to a hospital, *after* she had been under treatment for seven days and *only* because of her refusal to agree to surgery.

No action has been taken in regard to the patient by virtue of any order entered in this case and no action is contemplated except amputation if and when such becomes imperatively necessary to save her life.

This is not a case of wrongful custody or detention, but a case limited to the issue of competency to consent to surgery and the furnishing of competent consent.

▆▆▆ Appellant's brief presents several serious issues which this Court answers as follows:

1. Does the State have the constitutional power to act for incompetents?— Answer: It has.

2. Does the power of the State over incompetents extend to partial incompetents? Answer: To the extent of the partial incompetency, Yes.

3. Is the patient incompetent? Answer, Yes, partially, to the extent indicated.

4. Is the patient in imminent danger of death? Answer, Yes, sufficient to invoke T.C.A. 14–2306a.

5. Is an order authorizing amputation justified? Answer, Yes, within the limitations and guidelines of the order entered by this Court on January 28, 1978.

6. Has the patient been accorded due process? Answer: The procedure before the Chancellor *and* this Court, taken together, satisfies due process.

7. Is Title 14, Chapter 23, T.C.A. constitutional? Answer, Yes.

By order of the Presiding Judge of this Court, a brief has been filed by the Society for the Right to Die, Inc. The discussion therein is largely irrelevant in the light of the finding of fact that the patient is incompetent on the subject of feet, amputation and death.

The order of the Chancellor entered on January 25, 1978, and previously quoted is modified to read as follows:

"The Court is of the opinion that Mary C. Northern is in imminent danger of death if she does not receive certain protective services and she lacks the capacity to consent to said protective services."

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that

"1. Mary C. Northern is in imminent danger of death if she does not receive surgical amputation of her lower extremities and she lacks the capacity to consent or refuse consent for such surgery.

"2. That Honorable Horace Bass, Commissioner of Human Services of the State of Tennessee or his successor in

office is hereby designated and authorized to act for and on behalf of said Mary C. Northern in consenting to surgical amputation of her lower extremities and of exercising such custodial supervision as is necessarily incident thereto at any time that Drs. Amos D. Tackett and R. Benton Adkins join in signing a written certificate that Mary C. Northern's condition has developed to such a critical stage as to demand immediate amputation to save her life. The previous order of this Court is likewise so modified.

As modified, the order of the Chancellor is affirmed. The cause is remanded for further appropriate proceedings including fixing of such additional guardian ad litem fee as may be appropriate.

Modified, Affirmed and Remanded.*

PARROTT, P. J., E. S., concurs.

DROWOTA, J., concurs in separate concurring opinion.

DROWOTA, Judge, concurring.

While I am in complete agreement with the opinion of the Court, I believe it worthwhile to try to elucidate and emphasize the central issue around which this entire litigation revolves: Is Miss Mary Northern at this time mentally and emotionally competent to decide whether or not to permit amputation of her gangrenous feet? There appears to be some confusion, reflected in some of the arguments advanced to us, as to what this issue means and how this Court has treated it in the instant case. The arguments of both the guardian *ad litem* and the *amicus curiae* at times suggest that the crux of the matter is the legal question of whether an individual possesses the right to accept or reject medical treatment in a life-threatening situation, sometimes popularly referred to as a "right to die." In this opinion, I would like to make it clear that this Court has little or no quarrel with such a legal *principle,* and that the crux of this case is the issue of Miss Northern's competence, gauged to the best of the Court's ability from the *facts*

presented to us, to exercise her legal right to choose.

Many features remove this case from the realm of the ordinary, but one of the most striking is the absence of the usual presentation to the Court of diametrically opposite points of view. This is not a true adversary proceeding, as are most cases. All the parties and participants in the suit, as well as the Court, are acting in a good faith attempt to serve the best interest of Miss Northern. Due to the life-threatening character of Miss Northern's problem, her unwillingness to recognize it and her reluctance to discuss it, the publicity attending the case, and the varying vantage points of those concerned, there are naturally differing opinions on what is in her best interests. Medically, there is little question that she is or soon will be in imminent danger of death from the gangrenous condition of her feet. The legal question to be answered is what, if anything, should be done about this situation. The answer to this question, of course, depends on both the particular facts of the case and the principles which the Court applies to them. The difficulties in this case arise because of the delicacy and closeness of the factual question of Miss Northern's competence in this very unusual situation, while much of the reaction to the case has dealt with whether or how far the Court is recognizing the principle that a person should not be forced to undergo medical treatment against his or her will. The decision in this case does not conflict with that principle.

We have been cited to authority stating that a person has a right to refuse medical treatment even if death will result, and even if his choice would be considered foolish by many people. See *Application of President & Directors of Georgetown College, Inc.,* 118 U.S.App.D.C. 80, 331 F.2d 1010, 1017 (1964) (dissenting opinion). The relatively few reported cases in this area are discussed at length in two law review

---

* On May 1, 1978, Mary Northern died in a Nashville hospital as the result of a clot from the gangrenous tissue migrating through the bloodstream to a vital organ. Because

of complications rendering surgery more dangerous, the proposed surgery was never performed.

articles to which we have been referred. Byrn, *Compulsory Lifesaving Treatment for the Competent Adult,* 44 Fordham L.Rev. 1 (1975); Cantor, *A Patient's Decision to Decline Lifesaving Medical Treatment: Bodily Integrity versus the Preservation of Life,* 26 Rutgers L.Rev. 228 (1973). An example of the cases discussed is *In re Yetter,* 62 Pa.D. & C.2d 619 (C.P., Northampton County 1973). There, the court refused to order diagnostic and corrective surgery for an allegedly incompetent woman who did not want it. The woman had developed delusional reasons for refusing surgery, but the court based its decision on findings that her refusal of the same treatment at an earlier time had been made while she was competent and indicated her true desire, and that her subsequent delusions were not her primary reason for rejecting treatment. Similarly, in *In re Estate of Brooks,* 32 Ill.2d 361, 205 N.E.2d 435 (1965), the Court held it proper to refuse to order an emergency blood transfusion for a woman who, though disoriented when admitted to the hospital, in the past had repeatedly stated her religious opposition to receiving such treatment. Other decisions upholding the individual's right to refuse treatment against various asserted state interests in preserving his life are discussed in the two articles.

The question of when a competent individual may refuse lifesaving medical treatment has not been addressed in this State, nor has it now been decided in this case. Since the question has received so much undue attention with regard to this case, however, I wish to state that I am generally in agreement with the principles espoused in the authorities mentioned above, and I believe that the other members of this Court are as well. Yet these principles are not at issue in the instant case, in which the controlling question is one of competence. The applicable principle here, recognized even in authority vigorously defending the right to choose in most situations, is that "[t]he state, as *parens patriae,* has a special duty to help the person who is mentally incompetent to make such vital decisions as whether to submit to necessary treatment." Byrn, *supra,* at 24. The initial assumption

must be that the patient desires lifesaving treatment, unless that assumption is contradicted by previous statements competently made as in *Yetter* and *Brooks.* In cases of incompetence to choose, the court's function is "to make a good faith finding with respect to what the desires of the patient would have been had he been conscious and competent." Byrn, *supra,* at 25.

In the instant case, a statute guides the courts in proceeding properly in such cases. The two basic safeguards against unconstitutional use of T.C.A. § 14–2306(a) are that it cannot be invoked absent proof to the court "that the elderly person is in imminent danger of death . . . and lacks capacity to consent to protective services." These decisions are necessarily made on an *ad hoc* basis, case by case. Although the statute does not spell it out, it is clear that valid decisions on these two issues can only be made, and will only be upheld, if they are based on information as complete as time permits to be collected. This will generally require evidence such as medical opinions, psychiatric examination results, lay witness testimony, and any testimony it is possible to obtain from the patient. If, based on such evidence, there is a finding by the court that the patient is in imminent danger of death and lacks capacity to consent, the court must proceed to make its good faith judgment as to what should be done.

In the instant case, the Court found that Miss Northern does not have the capacity to decide whether her feet should or should not be amputated. This finding is not based on any belief by this Court that a competent adult should not be permitted to reject lifesaving treatment. It is *not,* as has been argued to us, based on any idea of this Court that any person who refuses treatment we subjectively think a "normal" or "rational" person would choose is "incompetent" merely because of that refusal. It is based on the Court's finding that Miss Northern is unable or unwilling to comprehend even dimly certain very basic *facts,* without which no one, whether elderly lady, doctor, or judge, would be competent to make such a decision. These facts include

the appearance of her feet, which are disfigured, coal black, crusty, cracking, oozing, and rancid. Yet, Miss Northern looks at them and insists that nothing is wrong. Also included is the fact that her doctors are of the opinion that her life is in danger, yet she has expressed no understanding of either the gravity or the consequences of her medical condition. Again, this Court respects Miss Northern's right to disagree with medical opinions and advice. Again, if this Court in good faith could find that she perceived as facts that her feet *do* look and smell as they do, and that her doctors *are* telling her that she needs surgery to save her life, we would not interfere with whatever decision she made regardless of how much it conflicted with the substance of her medical advice or with what we ourselves might have chosen. But from our honest evaluation of the facts and evidence of this case, we have been forced to conclude that Miss Northern does not comprehend such basic facts and hence is currently incompetent to decide this particular question. While this finding was made more difficult by Miss Northern's apparent ability to grasp facts not related to the condition of her feet, it is nonetheless correct.

Since Miss Northern was not competent to decide the question of amputation, it fell to the Chancellor and then to this Court to do so. Again, the question for me is what would Miss Northern decide if she understood the facts. The presumption with any person must be that he would want surgery that would increase the chance of life from 5–10% to 50%, unless some statement made or attitude held while the patient was competent contradicts the presumption. No such contradiction exists in Miss Northern's case. Further, the presumption is strengthened, if anything, by Miss Northern's assertions that she does not want to die. Medically, her feet are dead and lost to her whether or not they are amputated. Psychotic effects are likely if surgery is done, but are quite possible even if Miss Northern survives and loses her feet without surgery. Her prognosis is poor either way, but there is a substantially better chance of life if the surgery is performed. In these circumstances, this Court simply could not find that Miss Northern, if she had a basic understanding of the situation, would not choose the substantially greater chance of life that surgery offers. Our decision has been made accordingly, but we have modified and narrowed the Chancellor's order so that consent may only be given by one responsible individual and only when Miss Northern's doctors certify that surgery is necessary immediately to save her life. This is our best approximation of what a competent Mary Northern would want under these circumstances.

To make a final point, I return to the legal principle that a competent adult is free to accept or reject lifesaving medical treatment. The point is that, while I have said that I and the other members of this Court fully support that view, it is by no means universally adhered to. The articles by Byrn and Cantor, *supra,* recognize that some courts have held against such a principle in various situations. Indeed, our own State Supreme Court may well be one of these. In a so-called "snake-handling" case, this Court held that, while provisions must be made to protect onlookers and children, handling of poisonous snakes pursuant to religious beliefs could not constitutionally be banned as a nuisance or to protect the lives and health of the handlers themselves. *State ex rel. Swann v. Pack,* unreported opinion Tenn.Ct.App., Eastern Section, October 25, 1974. Our Supreme Court, however, unanimously reversed this holding and declared that both snake-handling and the drinking of strychnine could be enjoined constitutionally by the State. Finding that the State has a "compelling interest" in a "strong, healthy, robust, taxpaying citizenry," the Court said "Yes, the state has a right to protect a person from himself and to demand that he protect his own life." *State ex rel. Swann v. Pack,* 527 S.W.2d 99, 113 (Tenn.1975). While I do not agree with this statement, much less with any attempt to extend it beyond the facts of *Pack,* I point out the possibility that this legal rationale could be used by another court to "protect" Mary Northern against herself by

imposing surgery on her against her will even were she competent to make her own decision.

The instant case has been a difficult one. My only purpose in writing this concurring opinion is to emphasize that the difficulty lay not in legal principles and the constitutional rights of competent citizens, but in the factual question of whether or not Mary Northern is competent to exercise the right to choose in this case. I have also tried to emphasize that this Court bases its negative answer to that question not on Miss Northern's failure to "conform" or to do what we or the community might think is "sensible," but on her inability to comprehend basic concrete facts relating to her condition. No one lacking such comprehension of facts essential to an informed decision would be competent to make that decision. Though Miss Northern's case is, to me, undoubtedly close to the constitutional limits of the state's power over an individual, it is within those limits. It is clear to me that the Court has correctly and constitutionally found Miss Northern incompetent to decide the question of amputation of her feet, and has correctly resolved that question in her best interests to the best of its ability.