IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 19, 2009 Session

# IN RE CONSERVATORSHIP OF LILA M. TROUT

**An Appeal from the Probate Court for Shelby County**
**No. D-3289     Robert Benham, Judge**

---

**No. W2008-01530-COA-R3-CV - Filed October 15, 2009**

---

This appeal involves a conservatorship. When the respondent was eighty-three years old, her sister died and left the respondent over $200,000. The bulk of the inheritance was placed in an irrevocable trust for the respondent's benefit, and the deceased sister's former attorney was appointed as the trustee. Soon, the respondent began to spend her inheritance at a rapid rate, with much of the spending benefitting her daughter and her daughter's boyfriend. The respondent then purchased a $200,000 home to live in with her daughter and her daughter's boyfriend, with the expectation that the $1,800 monthly mortgage would be paid out of the trust. The attorney trustee sought to meet with the respondent and her daughter to establish a budget, but they refused to meet. The trustee then discovered that, in a short period of time, the respondent had amassed substantial credit card debt and had significantly depleted her certificates of deposit. The trustee filed the instant petition to establish a conservatorship over the person and the estate of the respondent. The trial court appointed a guardian ad litem and held a hearing on the petition, in which the respondent testified. During her testimony, the respondent requested an attorney to represent her. The trial court did not do so and continued with the hearing. After the hearing, the trial court established a conservatorship over the person and the property of the respondent. The respondent now appeals, arguing, *inter alia*, that the trial court erred in refusing to appoint an attorney ad litem upon her request, that the trial court erred in finding the evidence sufficient to establish a conservatorship over her person and property, and that, alternatively, the trial court erred in failing to restrict the conservatorship to her property. We affirm the trial court's decision in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

F. Auston Wortman, III, and Terry C. Cox, Collierville, Tennessee, for the appellant, Lila M. Trout.

Lynn W. Thompson, Memphis, Tennessee, for the appellees, Thomas R. Buckner and Dorothy Bobo, Conservator of the Estate of Lila Trout.

**OPINION**

# FACTUAL BACKGROUND

When Doris McCaslin ("Ms. McCaslin") engaged her long-time attorney Thomas R. Buckner to draft her will, she designated her elderly sister, Respondent/Appellant Lila M Trout ("Ms. Trout") as her sole beneficiary. At the time, Ms. McCaslin expressed to Buckner her concern that one of Ms. Trout's daughters, Susan Stevens ("Susan"), might take financial advantage of her mother. Susan had limited earning capacity, and she quit working altogether in December 2000 because of mental problems and drug and alcohol addictions.

Ms. McCaslin died on January 11, 2003, when Ms. Trout was eighty-three years old. Ms. Trout received $208,000 from Ms. McCaslin's estate. Out of respect for Ms. McCaslin, Buckner explained Ms. McCaslin's concerns about Susan to Ms. Trout and advised her that she could protect her inheritance by putting the money in a trust for her own benefit.

At the time, Ms. Trout agreed that a trust for her protection was appropriate. Therefore, on July 1, 2003, $163,000 of her inheritance was placed in the Lila M. Trout Irrevocable Trust for the use and benefit of Ms. Trout ("the irrevocable trust"). Buckner was designated as the trustee and was the sole signatory on this trust. Of the remainder of Ms. Trout's inheritance, $15,000 was paid directly to Ms. Trout, and $30,000 was placed in certificates of deposit in Ms. Trout's name. In addition, Ms. Trout and Ms. McCaslin had shared ownership in a joint checking account with a $30,000 balance; this passed directly to Ms. Trout outside of probate.[1] The checking account and the certificates of deposit were held in a revocable trust for the use and benefit of Ms. Trout in order to avoid probating these items upon Ms. Trout's death. Ms. Trout was the sole signatory on the revocable trust. A third trust for Ms. Trout's other daughter, Cecelia Caldwell, referred to as the Cecelia Caldwell Trust, was established in late 2004 with $9,900 from the irrevocable trust. The Cecelia Caldwell Trust was established in order to equalize distributions to Ms. Trout's daughters; whenever Ms. Trout made payments to or on behalf of Susan, an equal amount was to be put into the Cecelia Caldwell Trust. However, Ms. Trout was the beneficiary of the Cecelia Caldwell Trust during her lifetime, so these funds would be available to her if the need arose. Buckner was the sole signatory on the Cecelia Caldwell Trust as well.

Shortly after the irrevocable trust was established, Buckner began receiving numerous requests from Ms. Trout for cash from the corpus of the trust. Buckner paid some of Ms. Trout's bills directly from the trust, such as rent and utilities. Buckner also distributed about $300 per month to Ms. Trout for incidentals; he received little information about how the incidental money was used.[2]

---

[1] When Ms. McCaslin died, Susan and Ms. Trout's other daughter, Cecelia Caldwell, were added as signatories on the account. This was done so that the proceeds in the account would pass to the daughters outside of probate upon Ms. Trout's death.

[2] The amount of cash given to Ms. Trout for incidentals each month is somewhat unclear, but it appears that she received about $300 cash per month.

During this time, Susan lived in the apartment next door to Ms. Trout. Susan shared the apartment with her long-time boyfriend, Steve Hawks ("Hawks"). At Ms. Trout's request, Buckner agreed to pay Susan's rent of $738 per month from the irrevocable trust, because Susan was caring for Ms. Trout's needs. In 2004, Buckner used $17,000 from the irrevocable trust to purchase a vehicle for Ms. Trout so that Susan could take Ms. Trout to her appointments, because Ms. Trout did not drive. Within the year, however, the car was wrecked (through no fault of Ms. Trout or Susan), and the insurance company paid out the total value of the car. Buckner was never informed to whom the insurance check was written or how that money was spent. Later, without Buckner's knowledge, Ms. Trout financed another vehicle; Buckner learned of it when the financing company contacted him to arrange to receive the monthly note payments out of the irrevocable trust.

At the same time, Buckner became aware that the money in the revocable trust, under the control of Ms. Trout, was being spent as well. When Buckner inquired of Ms. Trout and Susan regarding how Ms. Trout's money was being used, he did not receive a response.

In light of these occurrences, Buckner became concerned that Ms. Trout's assets were being consumed so rapidly that she would not have sufficient funds to meet her needs during her lifetime. Therefore, as trustee of the irrevocable trust, Buckner contacted Ms. Trout and Susan to schedule a meeting to discuss a budget and a reduction of the monetary outlay, in order to ensure that Ms. Trout's assets would be conserved for her needs. Ms. Trout and Susan did not cooperate with Buckner's request, and the meeting never happened. According to Buckner's records, between October 2003 and June 2005, nineteen meetings were scheduled and were either canceled or simply not attended by Ms. Trout and Susan.

In early 2007, Buckner learned that Ms. Trout had purchased a home in Lakeland, Tennessee, for $212,500, complete with a 30-year mortgage and a note of over $1,800 per month. Susan and Hawks lived in the home with Ms. Trout, but they apparently paid no household expenses. After discovering the home purchase, Buckner implemented a strategy designed to reduce the monetary outlay from the irrevocable trust and pressure Ms. Trout and Susan to meet with him to establish a budget. To this end, he paid only Ms. Trout's basic expenses from the trust, such as the house note and utilities, and eliminated nonessentials, such as cable television. This apparently did not have the intended effect, as neither Ms. Trout nor Susan contacted Buckner to meet with him.

### PROCEEDINGS BELOW

Alarmed at the diminishing balance of trust monies, on July 23, 2007, Buckner filed the instant petition to establish a conservatorship of the person and of the estate of Ms. Trout, who was eighty-seven years old at the time.[3] In the petition, Buckner asserted that a conservatorship was necessary because Ms. Trout was not competent by reason of age, physical and mental condition, and undue influence of others to manage her own personal and financial affairs. A guardian ad litem

---

[3]"A petition for the appointment of a conservator may be filed by any person having knowledge of the circumstances necessitating the appointment of a conservator." Tenn. Code Ann. § 34-3-102 (2007).

-3-

was appointed for Ms. Trout, and a hearing on the petition was set for September 25, 2007.[4] On July 25, 2007, Ms. Trout received a notice of the petition and the hearing, which listed her rights as a respondent as delineated in Tennessee Code Annotated § 34-3-106, including her right to "[h]ave an attorney ad litem appointed to advocate" her interests.[5] In addition, notice of the hearing was sent to Susan and to Ms. Trout's other daughter, Cecelia Caldwell ("Cecelia"), who lives near Nashville, Tennessee. After receiving notice of the conservatorship proceedings, Susan contacted an attorney, Eugene Douglass ("Douglass"), to represent Susan's interests in the matter. No attorney was retained for Ms. Trout, and no request for an attorney for Ms. Trout was made to the trial court.

On September 11, 2007, by consent, the trial court rescheduled the hearing for October 15, 2007. On September 19, 2007, the trial court entered another consent order requiring Ms. Trout to submit to a psychological exam. The order requiring an exam was necessary "due to [Ms. Trout's] lack of cooperation." Ms. Trout was ordered to report to Mohammed Al-Taher, M.D. ("Dr. Al-Taher"), for the examination.

On October 4, 2007, Dr. Al-Taher performed a one-hour psychiatric evaluation on Ms. Trout. His two-page report was filed for the trial court's consideration. As to Ms. Trout's medical history, Dr. Al-Taher noted that she suffers from chronic obstructive pulmonary disease ("COPD"), cataracts and retinal detachment, and hearing loss. He described her as friendly and polite, calm and cooperative. He found Ms. Trout to be mentally competent, scoring 29 out of 30 on a "mini mental status exam," and opined that she seemed "overall competent to make medical decisions." Dr. Al-Taher found no symptoms of dementia, psychosis, mood, or anxiety disorder. He related that Ms. Trout told him that Susan and Hawks give her "A+" care, and that Buckner wanted "to take over everything" she does. Dr. Al-Taher also related that Ms. Trout believed that Susan spent the trust money for her (Ms. Trout's) benefit, and had no suspicion of irresponsible spending.

In his report, Dr. Al-Taher indicated that Ms. Trout was unaware of the amount of her monthly expenditures or how much of her trust money remained. When asked what she would do if the money ran out, Ms. Trout responded that she would "have to find 'a room somewhere' with her Social Security check to pay for that." Dr. Al-Taher recommended that Ms. Trout watch her finances more closely, and recommended further that Ms. Trout's finances not be entrusted to Susan. He commented that Ms. Trout might be "unwilling to consider that her finances are being mismanaged because she is afraid to give up the quality of care provided by [Susan and Hawks]. Therefore, the question of undue influence cannot be ignored in this situation." Dr. Al-Taher's

---

[4] On September 4, 2007, a substitute guardian ad litem, John Wilkinson, III, was appointed for Ms. Trout.

[5] Under Tennessee Code Annotated § 34-3-106, a respondent has the right to:

(1) On demand by respondent or the guardian ad litem, a hearing on the issue of disability;
(2) Present evidence and confront and cross-examine witnesses;
(3) Appeal the final decision on the petition;
(4) Attend any hearing; and
(5) Have an attorney ad litem appointed to advocate the interests of the respondent.

Tenn. Code Ann. § 34-3-106 (2007).

report concluded that, while Ms. Trout "appears competent to make major decisions . . ., emotional factors like fear of being abandoned could be influencing her to make decisions that would adversely affect her mental and physical well being in the future."

On October 11, 2007, the Guardian Ad Litem ("GAL") submitted to the trial court his "Answer, Report and Recommendation" on behalf of Ms. Trout. The GAL's extensive investigation included personally consulting with Ms. Trout, both of her daughters, Buckner, Buckner's attorney, Dr. Al-Taher, and Ms. Trout's physician, Dr. Herminio B. Balderama ("Dr. Balderama"). He also met with an officer of Ms. Trout's bank and obtained access to her banking records and her credit report.

In his report to the trial court, the GAL noted that, beginning in 2004, both Ms. Trout and Susan declined to communicate with Buckner and refused to cooperate with him. He indicated that it took great effort to finally persuade Susan to transport Ms. Trout to Dr. Al-Taher for her court-ordered psychological evaluation. While Ms. Trout lived independently in an apartment at the time the trusts were established, the GAL found that Ms. Trout "would not be able to live independently at this time." He noted that Ms. Trout had become increasingly alienated from her daughter Cecelia and refused to communicate with her, much to Cecelia's concern. For her part, Ms. Trout told the GAL that Cecelia "does not care for her."

The GAL found that Ms. Trout's income totaled about $1,100 per month, comprised of $900 from social security payments and $200 from a University of Florida pension. Despite this meager income level, Ms. Trout vacated her apartment and purchased the new home in Lakeland, carrying a 30-year mortgage with a note of over $1,800 per month. Ms. Trout's $1,100 per month income did not cover the expenses that were not paid by the trust. The average balance in Ms. Trout's checking account was approximately $1,000, and during the year preceding the GAL's report, there had been thirteen overdrafts. The GAL found that the other monies that Ms. Trout received from Ms. McCaslin's estate, held in the revocable trust, were completely gone. Specifically, he stated that over $41,000 in five certificates of deposit had been cashed out, and there was no record of how the money was used. "[E]ven more telling," the GAL noted, was the $61,000 in credit card debt that Ms. Trout had amassed since Ms. McCaslin's death, generated from "no less than nine" credit cards. He could not account for the insurance proceeds from the accident involving the first car the trust had purchased for Susan to transport Ms. Trout, and a second car purchased in Ms. Trout's name had been repossessed. By the time the GAL issued his report, there was only $70,000 left in the irrevocable trust established for Ms. Trout's benefit.

In his report, the GAL found that the level of spending clearly exceeded Ms. Trout's demonstrated needs, and that the debts had been incurred without regard to Ms. Trout's financial means, showing a "high degree of financial disregard." From the circumstances and his interview with Ms. Trout, the GAL concluded that Ms. Trout had "no present concept of financial responsibility," and "very little insight into her current finances and . . . little concept of what it is going to take to meet her needs throughout the remaining years of her life. She is unaware of her current debt situation." While Ms. Trout may have had some concept of financial responsibility when she set up the trusts, the GAL found, she no longer does. The GAL noted that Ms. Trout had the perception that she had been "tricked" by Buckner and Cecelia into establishing the trusts. The GAL found this perception to be baseless, observing that, had the trusts had not been established,

Ms. Trout would be penniless with "nothing to show for it." Given all of these circumstances, despite Dr. Al-Taher's finding of mental competency, the GAL was of the opinion that Ms. Trout needed a conservator of her person and her property. He characterized Ms. Trout as "either horribly financially irresponsible on her own, or she is being taken undue advantage of and unduly influenced, all to her detriment." Accordingly, he concluded that the appointment of a conservator for Ms. Trout was warranted and was in her best interest, due to "serious impairments to her functional capacity and to her decision making capacity."

On October 15, 2007, the trial court conducted the hearing as scheduled. At the outset, attorney Douglass, appearing on behalf of Susan, informed the trial court that Ms. Trout wanted her own attorney, and suggested that the case be continued to permit her to retain one. The trial court refused to continue the case, noting that it had already been continued once and that Douglass, as attorney for Susan, had no standing to make requests on behalf of Ms. Trout. The trial court also noted that neither the GAL nor Ms. Trout had made a request for an attorney ad litem.

At the hearing, testimony was adduced from Buckner, Ms. Trout, Susan, Hawks, and Cecelia. Buckner testified that, when the trusts were initially established, Ms. Trout was "very independent . . . and she was very confident and understood the situation." He said that Ms. Trout thought that establishing the trusts was "an excellent idea," and specifically denied "tricking her" into establishing the trusts.

Buckner then related the series of events to the trial court. He testified about the numerous requests for cash from the irrevocable trust that he received from Ms. Trout and Susan shortly after he became trustee, as well as the significant amounts of money being spent from the assets in Ms. Trout's revocable trust, i.e., her checking account and the certificates of deposit. He said that his attempts to get information from Ms. Trout and Susan about the financial requests and the dwindling balance in the revocable trust were rebuffed. Buckner said that he wrote letters and called Ms. Trout and Susan to arrange a meeting regarding a budget, but they would not meet with him. Nineteen scheduled meetings were either cancelled or simply not attended. The few times Buckner was able to speak to Ms. Trout on the telephone, he said, her comments appeared to be "scripted," and Susan was always on the line as well.

Buckner learned about Ms. Trout's purchase of the Lakeland home after the fact, commenting that he was "shocked" that a financial institution would make such a loan to Ms. Trout at her age with her income. He met with Ms. Trout and Susan in that house on one occasion. From his observation at that meeting, Buckner described Ms. Trout as less independent than before, and he was "convinced that [Ms. Trout] really had less judgment by far than she did in 2003." Buckner testified that Susan and Hawks assured him at the time that they intended to pay some of the household expenses, but declined to identify which bills they were going to pay. After that, Buckner paid only the house note and the utilities from the trust. After this single visit, Ms. Trout and Susan would not see Buckner again.

Buckner told the trial court that he learned of Ms. Trout's over $60,000 in credit card debt when he received a telephone call from a credit card agent requesting payment. He later discovered that Susan had referred all of Ms. Trout's creditors to him, informing them that he, as trustee, would

pay Ms. Trout's credit card debts. He had no knowledge of what the charges were for or how they were incurred.

Buckner testified that, at the time of trial, Ms. Trout had only $70,000 remaining in the irrevocable trust and $30,000 in the Cecelia Caldwell Trust. He felt that the appointment of a conservator was necessary to conserve the remaining funds for Ms. Trout's benefit.

Ms. Trout testified on her own behalf. She answered questions about her background, her income, and her family. After Ms. Trout's husband died, about seven years before the trial date, Susan moved into the next-door apartment. During that time, Ms. Trout had been able to live on her $1,100 per month income. Asked if she had any other debt at that time, such as a car note, Ms. Trout replied, "I'm not real sure."

Ms. Trout testified that, for a while, Susan was working two jobs and was financially supporting herself. At some point, however, Susan stopped working because of a mental disability, the nature of which Ms. Trout did not know. Ms. Trout recalled requesting that Buckner pay Susan's rent and expenses out of the irrevocable trust, but was uncertain about the timing. She maintained that Susan took care of her needs at all times. When asked if she agreed to pay Susan's bills in exchange for her constant care, Ms. Trout responded, "I don't remember."

Ms. Trout claimed that she contacted a real estate agent about finding her a house in which to live with Susan and Hawks. Asked if she gave the real estate agent a budget, Ms. Trout replied, "I think so." When asked whether she, Susan, and Hawks agreed on how to divide the expenses among them, Ms. Trout replied, "I don't remember." Ms. Trout indicated that the house note payments were made from a joint account she held with Susan. Ms. Trout thought that Susan paid the utilities, though she did not know whether Susan had her own checking account. Ms. Trout was aware that, for the year preceding the trial, her daughter Cecelia had been trying to contact her. Ms. Trout explained that she had not responded to Cecelia's calls because she thought it would be better to wait until the legal proceedings were over to resume that relationship.

When asked to identify her assets, Ms. Trout responded, "I don't own anything" except the house. Asked about her debts, Ms. Trout acknowledged, "We had some charge accounts," but she did not know the identities of all of her creditors. Ms. Trout said that the credit card purchases were for necessities for her, Susan, and Hawks. When asked how much debt she had accrued, Ms. Trout responded, "A thousand. . . . It could have been as much as 10,000," but not as much as $20,000. Ms. Trout did not think that it was possible that her debt totaled as much as $60,000. Ms. Trout knew that she had owned a car, but did not know how much she owed on it. Ms. Trout claimed that she and Susan together negotiated the loan for the Lakeland house. She estimated that her debt on the house was "probably a hundred thousand [dollars]," and that her interest rate was "probably 1.5[%]." She was under the impression that Susan was a co-debtor on the house note. Ms. Trout was aware that Hawks did not work, but believed that he received a pension.

Ms. Trout testified about her medical condition. She arrived in court in a wheelchair, but testified that, in her home, she uses a walker. Ms. Trout's only medication was for high blood pressure. Ms. Trout said that Susan made her doctor appointments and transported her to the

appointments. She said that she takes care of her own daily needs, can dress herself, and can prepare simple meals for herself.

Ms. Trout recalled meeting with Buckner about setting up the trusts. She testified that she was led to believe she would have access to her money any time she wanted, but said that this "wasn't true; whenever I wanted [money] it was like pulling out teeth." Ms. Trout acknowledged that her money was running out, but maintained that she still wanted Buckner to spend it for her. Once her money was gone, Ms. Trout believed that Susan and Hawks would support her. When asked what her plans would be if Susan and Hawks did not have sufficient income to support her, Ms. Trout said, "I haven't decided."

During his questioning of Ms. Trout, the GAL reminded her that she had been told about her right to an attorney, and noted that she had never formally requested one. The GAL then stated, "You have a right to tell this judge what you want in that regard if you want to say anything about that." Ms. Trout then stated, "I would like to request an attorney." When asked why she would request an attorney at that juncture, Ms. Trout replied, "Well, everybody else seems to have one." She again told the trial judge, "I'd like to have my attorney present."

The trial court also heard testimony from daughter Susan, then fifty-eight years old. Susan had been divorced for eighteen years and had two adult children. After her divorce, she filed for bankruptcy. She had worked in a variety of job positions at a psychiatric hospital for a total of nine to ten years. After that, Susan worked as a case manager at an alcohol and drug treatment facility, but this job lasted less than a year. After Susan quit the case manager job, she obtained two part-time jobs at a substantially lower compensation level than for the case manager position. Susan explained that her mental illness and alcohol and drug problems left her unable to cope with the stress associated with the case manager job. Since 1989, Susan had received both inpatient and outpatient treatment for depression and anxiety disorder; her last inpatient treatment was in approximately 2000; and after that, she stopped working altogether. She testified that she was taking both Prozac and Xanax for her anxiety issues. At the time of trial, Susan had no income; she had applied for disability benefits, but her claim had been denied and the denial was on appeal.

Susan claimed that she inherited $37,000 from Ms. McCaslin's estate. She said that all of her inherited money had been spent, and she had essentially no assets.

Susan was asked about the joint checking account that passed to Ms. Trout upon Ms. McCaslin's death. After Ms. McCaslin's died, both of Ms. Trout's daughters, Susan and Cecelia, were added to the account, ostensibly so that the account would pass to the daughters outside of probate upon Ms. Trout's death. Susan conceded that she had already spent all of the money in the account on her own personal needs. She claimed that Ms. Trout was aware of her actions. Susan added that she initially told Ms. Trout that she would pay her back, but never did so, purportedly because Ms. Trout never asked her for the money.

Susan testified that she had one credit card in her own name with a balance of approximately $100. She acknowledged that she had signatory powers on two of Ms. Trout's credit cards, and that she had used them for household expenses, dinners, gas, and the like. Susan could not estimate the

amount of credit card debt owed by her mother. She claimed that she was in the process of negotiating settlements for some of this debt, but could not recall the names of the credit card companies with which she was negotiating. When she was asked about the $300 in cash Buckner sent to Ms. Trout each month for incidentals, Susan had no recollection of how that money was spent.

Approximately a year before Ms. McCaslin died, Susan moved into the apartment next door to Ms. Trout. At different times, Susan said, both Ms. McCaslin and Ms. Trout had broken a hip, and Susan took care of each during their recovery. Susan claimed that she and Ms. Trout purchased the house in Lakeland because the leases on their respective apartments were going to expire and the rent was going to increase, and also because Ms. Trout's health had declined to the point that she "require[d] 24 hour seven day a week care." Susan was unaware of the balance of the mortgage on the Lakeland house, saying Buckner had that information.

Susan said that she had promised her mother that she would care for her for so long as she was able. Susan said that she had warned her mother that if a conservator were appointed, she might end up in a nursing home. When asked how she would support herself without her mother's money, Susan replied that either Hawks would support her or she would "be on the street."

The trial court also heard testimony from Susan's boyfriend, Steve Hawks ("Hawks"). Hawks testified that he is unable to work due to bipolar disorder, high blood pressure, diabetes, and liver disease. He receives $1,400 per month in disability benefits. Hawks said that his disability checks went toward household expenses. Hawks said that he has about $70,000 in a pension fund, and was "in the process" of setting up a monthly withdrawal from his pension fund to help with household expenses. When asked what would happen once Ms. Trout's trust monies and his pension monies were exhausted, Hawks replied that the household financial situation would be "lean," but they would get by somehow.

Ms. Trout's other daughter, Cecelia, testified at trial. Prior to 2004, she said, she and Ms. Trout had a very good relationship. Cecelia accompanied Ms. Trout to some of the meetings with Buckner to set up the trusts and to manage her inheritance, and she believed that, at the time, her mother understood the impact of the trusts. Before inheriting the estate monies, Cecelia stated, Ms. Trout had managed her finances well.

Cecelia indicated that the money Ms. Trout inherited began disappearing in approximately 2004; at the same time, Cecelia's relationship with Ms. Trout and Susan became tense. After about 2007, Cecelia stated, their relationship had deteriorated to the point that it became almost impossible to contact Ms. Trout. Cecelia attributed Ms. Trout's precarious financial situation as of the date of trial to her desire to take care of Susan and Susan's influence over her mother. Though she did not join the lawsuit as a petitioner, Cecelia believed that a conservator was needed to protect her mother's assets and her health.

At the conclusion of the hearing, the trial court issued an oral ruling that Buckner had shown by clear and convincing evidence that a conservatorship for Ms. Trout's person and estate was necessary. The trial court examined Ms. Trout's functional capacity and decision-making capacity

as detailed in ***In re Conservatorship of Groves***, 109 S.W.3d 317 (Tenn. Ct. App. 2003) ("***In re Groves***"). It found that the evidence showed that Ms. Trout "is not fully aware of the nature and extent of her assets, nor is she aware of the nature and extent of her liabilities. Ms. Trout obviously has physical problems and needs assistance with those physical problems." The trial court expressed "alarm" at the rate at which Ms. Trout's assets had declined in value, observing that "[t]his house of cards is about to collapse." The trial described Ms. Trout, Susan, and Hawks as three disabled people living in a house they could not afford. In light of this, the trial court appointed an independent conservator over the person and estate of Ms. Trout and ordered the conservator to develop and file a property management plan and a personal management plan for Ms. Trout. The trial court stated that, "pending the approval of a property management plan and personal management plan and maybe even afterwards," it would be in Ms. Trout's best interest to live with Susan "because she needs somebody to physically take care of her." On October 16, 2007, the trial court entered a written order consistent with its oral ruling, finding "by clear and convincing proof . . . [that Ms. Trout] is a 'disabled person' under Tenn. Code Ann. §34-1-101(7) who lacks the functional capacity and decision-making capacity to wholly care for herself or manage her property" and, therefore, needs a conservator.

After that, Ms. Trout retained an attorney and, on November 14, 2007, filed a motion pursuant to Rule 59 of the Tennessee Rules of Civil Procedure for a new trial or, in the alternative, to alter or amend the court's prior order.[6] Ms. Trout argued that she was entitled to a new trial because she did not retain an attorney prior to the hearing, and an attorney ad litem ("AAL") was not appointed for her upon her request as is required pursuant to Tennessee Code Annotated § 34-1-125. Ms. Trout maintained that the evidence did not support the trial court's finding that she was in need of a conservator for her person or property, and asserted that the conservator appointed was not qualified because she was not a Tennessee resident. Susan filed a pleading joining in and supporting Ms. Trout's motion. The GAL filed a response to Ms. Trout's motion for a new trial stating, among other things, that he had no objection to the trial court allowing Ms. Trout to retain the right to vote and the right to make her own medical decisions, but he objected to Ms. Trout retaining the right to make her own residential decisions, because such decisions would impact her "already disastrous financial situation." Buckner filed a response as well, objecting to the motion for a new trial or to alter or amend the judgment.

On January 30, 2008, the trial court conducted a hearing on Ms. Trout's motion for a new trial. On the day of the hearing, Ms. Trout was taken to the hospital emergency room with breathing problems, and her attorney requested a continuance on that basis, informing the trial court that he had planned to call Ms. Trout to testify. The trial court denied the request for a continuance and proceeded with the hearing. At the conclusion, the trial court denied the motion for a new trial, adhering to its original decision *in toto*. On April 17, 2008, the trial court entered a written order on the motion, incorporating its oral ruling. From this order, Ms. Trout now appeals, naming both Buckner and the court-appointed conservator, Dorothy Bobo ("Ms. Bobo") (collectively, "Appellees"), as Appellees.

_____

[6]The attorney's fees incurred by Ms. Trout were paid by Hawks.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Ms. Trout raises the following issues on appeal:

1.  Whether the trial court erred in refusing to appoint an attorney ad litem to represent her during the October 15, 2007 hearing, despite her request for counsel?
2.  Whether the trial court erred in the appointment of an out-of-state person as conservator?
3.  Whether the trial court erred in finding that the evidence presented at the October 15, 2007 hearing clearly and convincingly established that Ms. Trout is a "disabled person" as defined in Tennessee Code Annotated § 34-1-101(7) in need of this Court's assistance, as is required by Tennessee Code Annotated § 34-1-126?
4.  Whether the trial court erred in refusing to continue the January 30, 2008 hearing on Ms. Trout's Rule 59 motion, despite Ms. Trout's absence due to her emergency hospitalization?
5.  Whether the evidence is sufficient to support the appointment of a conservator of both the person and the estate of Ms. Trout, *i.e.*, whether the trial court erred in failing to impose the least restrictive alternatives on the conservatorship of Ms. Trout?

The issues raised on appeal by Ms. Trout involve differing standards of review:

> Appellate courts . . . may need to apply more than one standard of review when reviewing a lower court's decision appointing a conservator. To explain, a petition for the appointment of a conservator requires the lower court to make legal, factual, and discretionary determinations. Each of these determinations require different standards of review.

*Crumley v. Perdue*, No. 01-A-01-9704-CH-00168, 1997 WL 691532, *2 (Tenn. Ct. App. Nov. 7, 1997). Generally, a trial court's factual findings are reviewed *de novo* on the record with a presumption that those findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). When the factual findings are based on the trial court's assessment of the credibility of the witnesses, the appellate court will not disturb those findings absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Clear and convincing evidence is evidence that "eliminates all serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. Evidence satisfying this standard will produce in the fact-finder's mind a firm belief or conviction regarding the truth of the factual propositions sought to be established by the evidence." *In re Groves*, 109 S.W.3d at 330 (citations omitted).

The trial court's decision to appoint a conservator must be supported by clear and convincing evidence. *See id.*; Tenn. Code Ann. § 34-1-126 (2007). Given this heightened standard, the appellate court is required to adopt the customary standard of review, drawing "a distinction between specific facts and the combined weight of these facts." *In re Audrey S.*, 182 S.W.3d 838, 861 n.26

(Tenn. Ct. App. 2005) (applying this adapted standard in a proceeding where clear and convincing evidence is required to terminate parental rights). Thus, in this appeal, we must determine whether the combined weight of the trial court's findings of fact, as supported by a preponderance of the evidence in the record, establish clearly and convincingly that a conservatorship was warranted. *See In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (termination of parental rights case).

To the extent that the trial court's discretionary decisions are challenged on appeal, such decisions are reviewed for an abuse of that discretion. *In re Conservatorship of Davenport*, No. E2004-01505-COA-R3-CV, 2005 WL 3533299, at *6 (Tenn. Ct. App. Dec. 27, 2005). A trial court abuses its discretion when it reaches a decision that is not supported by the evidence, when it applies an incorrect legal standard, or when it reaches a decision that contravenes logic or employs reasoning that causes an injustice to the complaining party. *See Owens v. Owens*, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007).

In addition, this appeal involves the application of certain Tennessee statutes. "Statutory interpretation is a question of law, which we review *de novo*, with no presumption of correctness given to the courts below." *Sullivan v. Edwards Oil Co.*, 141 S.W.3d 544, 547 (Tenn. 2004) (citing *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003)).

ANALYSIS

Ms. Trout first argues that the trial court erred in refusing to appoint an attorney ad litem ("AAL") for her upon her request during the October 15, 2007 hearing. It is undisputed that the notice sent to Ms. Trout in July 2007 informed her of her right to an attorney upon request, and that she was subsequently informed by the GAL as well. It is also undisputed that prior to the day of trial in October 2007, Ms. Trout made no request for an attorney. The GAL "consciously" refrained from requesting an attorney on Ms. Trout's behalf because he did not feel that it was necessary. On the day of the hearing, the trial court rejected Douglass' request for an attorney for Ms. Trout, because Douglass represented daughter Susan and therefore did not have standing to make such a request on behalf of Ms. Trout. The trial court found that the case had been continued once before and timely action was needed to protect Ms. Trout's financial interests. Despite all of these factors, in response to direct questioning by the GAL, Ms. Trout told the trial court that she "would like to request an attorney," because "everybody else seem[ed] to have one." She reiterated to the trial court, "I'd like to have my attorney present." Nevertheless, the trial court maintained its refusal to continue the hearing and appoint an attorney for Ms. Trout.

On appeal, Ms. Trout argues that the trial court erred in refusing to appoint an AAL, because she had a statutory right to an AAL pursuant to Section 34-3-106(5),[7] and because Section 34-1-125(a) mandates the appointment of an AAL upon the request of a respondent:

> (a) The court ***shall*** appoint an attorney ad litem to represent the respondent on the respondent's request, upon the recommendation of the guardian ad litem or if it appears to the court to be necessary to protect the rights or interests of the respondent. The attorney ad litem shall be an advocate for the respondent in resisting the requested relief.

Tenn. Code Ann. § 34-1-125(a) (2007) (emphasis added). In light of the mandatory language in the statute, Ms. Trout maintains that the trial court was required to appoint an AAL upon her request.

At the outset, we note that the trial court correctly rejected the request made by attorney Douglass, who represented Susan. Nothing in the pertinent statutes requires the trial court to consider such a request. Section 34-1-125(a) sets out three events that actuate the trial court's appointment of an attorney ad litem, namely, a request by the respondent, a recommendation by the guardian ad litem, or a determination by the trial court that such an appointment is necessary. Here, there was no such recommendation by the GAL and no such determination by the trial court. There was, however, a request by the respondent, albeit a request made in the midst of the hearing. The

---

7

The respondent has the right to:

* * *

(5) Have an attorney ad litem appointed to advocate the interests of the respondent.

Tenn. Code Ann. § 34-3-106(5) (2007).

issue becomes whether, upon this request, the trial court was required under section 34-1-125(a) to adjourn the hearing and appoint an attorney for Ms. Trout.

Appellees argue that, despite the mandatory language in Section 34-1-125(a), we must also consider another statutory provision in the same chapter, section 34-1-121, which states:

(a) The court has broad discretion to require additional actions not specified in this chapter, and chapters 2 and 3 of this title as the court deems in the best interests of the minor or disabled person and the minor's or disabled person's property. The court also has *discretion to waive requirements* specified in this chapter, and chapters 2 and 3 of this title *if the court finds it is in the best interests of the minor or disabled person to waive such requirements, particularly in those instances where strict compliance would be too costly* or place an undue burden on the fiduciary or the minor or the disabled person.

Tenn. Code Ann. § 34-1-121(a) (2007) (emphasis added). These statutes, they argue, should be read *in pari materia*, that is, read together as a whole and not read individually in a vacuum. ***See Aldridge v. Aldridge (In re Conservatorship of Aldridge)***, No. W2006-02334-COA-R3-CV, 2007 WL 4170826, at *6 (Tenn. Ct. App. Nov. 27, 2007). Reading these statutes together, Appellees contend, leads to a conclusion that Section 34-1-121 gives the trial court discretion to waive the requirement in Section 34-1-125(a) if doing so is in the respondent's best interest.

Under the circumstances in this case, we conclude that the trial court did not err in declining to delay the hearing and appoint an AAL for Ms. Trout upon her request. As noted by the trial court, Ms. Trout was notified of her rights to an attorney well in advance of the hearing and "had ample time to secure representation," but she did not do so. The trial court observed that the appointment of an AAL at that juncture would further delay resolution of the case. It recognized that the situation required immediate action: "[T]he fact of the matter is that they're going to be broke unless we do something . . . [W]e've got a hemorrhage going on and we've got to put a tourniquet on it. . . . [J]ustice delayed is justice denied." In addition, the trial court had previously appointed a guardian ad litem "to represent and defend the interest of [Ms. Trout]."[8] In this instance, the GAL, John Wilkinson, III, gave the trial court an objective report on the matter, questioned witnesses and fully participated in the hearing both as a representative of Ms. Trout and as an officer of the court. We note that the trial court also actively questioned the witnesses in an effort to gain a full understanding of the facts. Under these circumstances, we agree with the trial court's determination that any potential benefit of appointing an AAL at that stage in the proceedings was far outweighed by the detriment to Ms. Trout of delaying decisive action to protect her remaining financial assets. Under these circumstances, we conclude that the trial court did not err in refusing to appoint an attorney ad litem for Ms. Trout.

---

[8]We recognize that the duty of an attorney ad litem differs from the duty of a guardian ad litem; the AAL is "to be an advocate for the respondent in resisting the requested relief," while the GAL does not necessarily advocate against the conservatorship. Rather, if the GAL believes that a conservatorship would be in the respondent's best interest, this opinion is reported to the court.

We next address Ms. Trout's argument that the trial court erred in appointing Ms. Bobo, a resident of Mississippi, as Ms. Trout's conservator. Ms. Trout argues that, under Tennessee Code Annotated § 35-50-107, Ms. Bobo is not qualified to serve as her conservator:

> (a)(1) Any person who is not a resident of this state or any corporation that is authorized to exercise fiduciary powers, but is not authorized to do business in this state and does not actually maintain an office in this state, shall not be appointed or allowed to serve as trustee of a corporate or personal trust, personal representative of an estate, guardian, conservator for an incompetent person, guardian for a minor or in any other fiduciary capacity, unless there is also appointed as a fiduciary to serve with such nonresident fiduciary, a person resident in this state or corporation authorized to do business in this state and that maintains an office in this state, *except as provided in subdivision (a)(2)*. . . .

Tenn. Code Ann. § 35-50-107(a)(1) (2007) (emphasis added). Ms. Trout notes that this statute states expressly that non-residents "shall not be appointed or allowed to serve as . . . conservator for an incompetent person." She ignores, however, the statutory provision: "except as provided in subdivision (a)(2)." Subdivision (a)(2)(F) states that "[a]ny person may serve as the conservator of the person of an incompetent person, regardless of the residence of the conservator." Tenn. Code Ann. § 35-50-107(a)(2)(F). Thus, the plain language in Section 35-50-107(a)(2)(F) permits the appointment of a non-resident conservator. In light of this provision, we find no error in the trial court's appointment of Ms. Bobo as the conservator for Ms. Trout.

Ms. Trout next argues that the trial court erred in determining that the evidence presented at the October 15, 2007 hearing clearly and convincingly established that she was either fully or partially disabled and in need of the trial court's assistance, as is required under Tennessee Code Annotated § 34-1-126. This statute provides:

> The court must find by clear and convincing evidence that the respondent is fully or partially disabled and that the respondent is in need of assistance from the court before a fiduciary can be appointed.

A "disabled person" is defined as:

> [A]ny person eighteen (18) years of age or older determined by the court to be in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity.

Tenn. Code Ann. § 34-1-101(7). Ms. Trout argues that no evidence was presented to support a finding of mental illness, developmental disability, or mental incapacity; therefore, the trial court's appointment of a conservator over her person and property must be reversed.

The analysis to be applied in conservatorship proceedings is set out in detail in ***In re Groves***, ***supra***. In an opinion written by Judge (now Justice) William C. Koch, Jr., the appellate court

-15-

observed that "[t]he appointment of conservators in Tennessee no longer hinges on a determination of incompetency." Under current law, the court explained, "the threshold question in every conservatorship proceeding is whether the person for whom a conservator is sought is disabled or incapacitated." *In re Groves*, 109 S.W.3d at 331. If the person is not deemed disabled or incapacitated, then a conservator may not be appointed. In the event that the person is found to be either disabled or incapacitated, "the court must then determine whether the person is fully or partially incapacitated and whether the incapacity is temporary or permanent." After making this finding, the trial court must then determine if the person needs supervision, assistance, or protection on either a full-time or part-time basis. If so, then the trial court is to appoint a conservator and "must specifically '[e]numerate the powers removed from the respondent and vested in the conservator.' " *Id.* (quoting Tennessee Code Annotated § 34-3-107(2)). "Any power not specifically vested in the conservator remains with the person for whom the conservator has been appointed." *Id.*

As in *In re Groves*, the trial court in the instant case was charged with determining the capacity of Ms. Trout, an elderly individual with certain physical and mental infirmities. The term "capacity" relates to both functional capacity and decision-making capacity. *Id.* at 334. The *In re Groves* court explained:

> In cases such as this one, capacity encompasses two concepts—functional capacity and decision-making capacity. Functional capacity relates to a person's ability to take care of oneself and one's property. Decision-making capacity relates to one's ability to make and communicate decisions with regard to caring for oneself and one's property. The distinction between cognitive capacity and competence in actual performance is somewhat artificial because functional capacity depends, in part, on decision-making capacity.
>
> Functional capacity to care for oneself involves a person's ability to perform basic daily activities. These activities, commonly referred to as ADLs and IADLs, include personal hygiene, obtaining nourishment, mobility, and addressing routine healthcare needs. An inquiry into functional capacity seeks to ascertain whether a person has functional impairment that endangers physical health or safety by rendering the person unable, either wholly or partially, to care for him or herself. Emphasis should be placed on a person's ability to carry out essential activities in his or her everyday environment, not in the laboratory, doctor's office, or courtroom. The examination should focus on behavior over time, not one or a few specific events whose prejudicial character may lead to a premature conclusion.
>
> Functional capacity to care for property involves a person's ability to manage personal property, real property, and finances. Because a person's ability to manage property depends on the size, type, and complexity of the person's holdings, the first step in the inquiry must be to identify the property that the person owns or controls. The focus of an inquiry into a person's functional capacity to manage property is on whether a person's functional inability to make or communicate decisions regarding the acquisition, administration, or disposition of his or her property may lead to the waste or dissipation of the property.

Decision-making capacity involves a person's ability (1) to take in and understand information, (2) to process the information in accordance with his or her own personal values and goals, (3) to make a decision based on the information, and (4) to communicate the decision. Requiring that decisions be tested against a person's own values and goals reflects the importance of determining a person's capacity in light of his or her own habitual standards of behavior and values, rather than the standards and values of others. A person does not lack decision-making capacity merely because he or she does things that others either do not understand or find disagreeable. Foolish, unconventional, eccentric, or unusual choices do not, by themselves, signal incapacity. However, choices that are based on deranged or delusional reasoning or irrational beliefs may signal decision-making incapacity.

An evaluation of decision-making capacity focuses chiefly on the process a person uses to make a decision and only secondarily on the decision itself. It analyzes a person's ability to understand pertinent information and to reason and deliberate about choices particular to a specific decision. Twenty-five years ago, we characterized this capacity as the "mental ability to make a rational decision." *State Dep't of Human Servs. v. Northern*, 563 S.W.2d 197, 209 (Tenn. Ct. App. 1978). We used the adjective "rational" to connote a decision based on a process of reasoning, not necessarily a decision that the prevailing majority would view as acceptable, sensible, or reasonable.

Persons frequently display different levels of decision-making ability. A person may be simultaneously capable and incapable with respect to different types of decisions. Courts routinely apply different standards for determining capacity depending on the nature of the decision or action involved. Accordingly, capacity should be determined on a decision-specific basis.

*Id.* at 334-36 (footnotes omitted).

In the case at bar, the trial court utilized the framework in *In re Groves* in determining whether Ms. Trout was a "disabled person" under the statute. Apparently referring to the language in *In re Groves*, the trial court found that Ms. Trout "lacks the functional capacity and decision-making capacity to wholly care for herself or manage her property." It concluded that, because of her disability, Ms. Trout was in need of a conservator for her person and her estate. On appeal, Ms. Trout argues that the trial court's conclusion is inconsistent with the report of Dr. Al-Taher, who opined that she was mentally competent, and that she was able to make major decisions, particularly with respect to certain medical matters. Ms. Trout also points out that the GAL found her to be mentally competent. Ms. Trout claims that, while the record may include some evidence of questionable financial decisions, "[f]oolish, unconventional, eccentric, or unusual choices do not, by themselves, signal incapacity." *Id.* at 335. Thus, Ms. Trout argues that there was not clear and convincing evidence showing that she is a disabled person in need of a conservator.

We disagree. While Ms. Trout is mentally competent, the record contains abundant evidence to support the trial court's conclusion that Ms. Trout lacked sufficient functional and decision-making capacity to care for her own needs. The most compelling evidence is Ms. Trout's own testimony, in which she exhibits almost no knowledge of her assets or her liabilities, with no

-17-

apparent understanding that she had $60,000 in credit card debt or the ramifications of taking on a $200,000 30-year mortgage.

Ms. Trout's decisions are not simply "foolish, unconventional, eccentric, or unusual choices." Indeed, the proof shows that the financial decisions are not being made by Ms. Trout. Rather, they are made by Susan who, as the trial court found, exerted "dominion and control" over Ms. Trout. This has led to disastrous results, with most of Ms. Trout's monies being used to the detriment of Ms. Trout and to the benefit of Susan and Hawks. In addition, under Susan's influence, Ms. Trout has become estranged from her other daughter, Cecelia, has refused to accept certified mail, has refused to communicate with Buckner, and has missed numerous doctor appointments. The evidence shows clearly and convincingly that Ms. Trout is disabled and in need of the assistance of the court's "supervision, protection, and assistance."

Ms. Trout argues in the alternative that, even if a conservatorship was appropriate, the trial court erred in failing to limit the scope of the conservatorship to her property. She argues that Dr. Al-Taher found that she was competent to make medical decisions, and the GAL agreed that she was competent to make some medical decisions.[9] Therefore, she claims, the conservatorship should have been limited to her property and should not have been imposed over her person.

In conservatorship proceedings, the trial court has "an affirmative duty to ascertain and impose the least restrictive alternatives upon the disabled person that are consistent with adequate protection of the disabled person and the disabled person's property." Tenn. Code Ann. § 34-1-127 (2007). In this case, the trial court below evaluated all of the evidence presented, as well as the witnesses, and concluded that it "was firmly of the opinion that there was the need of [a] conservator of the person," particularly with respect to housing decisions, explaining that housing decisions impact both Ms. Trout's finances and her overall well-being. The undisputed evidence showed that Ms. Trout must use either a walker or a wheelchair, has COPD, congestive heart failure, and other medical conditions, and that she requires 24-hour care seven days a week. Ms. Trout needs assistance with household tasks, such as cooking, cleaning, and laundry.

We agree with Ms. Trout that the trial court must determine the areas in which she retains functional decision-making capacity and limit the scope of the conservatorship accordingly. While a conservatorship is clearly warranted with respect to Ms. Trout's finances and her housing, whether the conservatorship should include medical decisions presents a closer question. As of the date of the hearing, Ms. Trout was mentally competent to make such decisions, and even the GAL indicated that she could do so. The evidence at trial did not include evidence of specific "medical decisions" made that were adverse to Ms. Trout's physical health. We recognize also that medical decisions are singularly personal ones, and the ability to make one's own medical decisions should not be compromised unless clearly necessary.

Nevertheless, the proof below established clearly that Ms. Trout herself had not retained any functional decision-making authority in any area, but had instead ceded effectively all decisions in

---

[9]After trial, Dr. Al-Taher issued a statement clarifying that his evaluation focused on Ms. Trout's general mental status, and that he did not "target any questions relating to conservatorship of her person."

all areas to her daughter Susan. Whatever the reason, Susan's decision-making consistently benefitted herself more than her mother, with decisions that included consuming her mother's financial resources, placing her mother in housing that cannot be financially sustained long-term, and encouraging her mother's estrangement from her other daughter Cecelia. In circumstances in which Ms. Trout herself has not retained functional decision-making authority, but has instead surrendered it to a person who has consistently abused it, we must reluctantly agree with the trial court's decision to include Ms. Trout's medical decisions within the scope of the conservatorship.

Finally, we address Ms. Trout's argument that the trial court erred in moving forward with the hearing on her Rule 59 motion for a new trial despite being notified that Ms. Trout had been hospitalized. Counsel for Ms. Trout requested postponement of the hearing until Ms. Trout could attend, because he expected that she would offer additional testimony at the hearing. Appellees opposed the continuance, arguing that a Rule 59 motion for a new trial does not require additional proof or testimony; rather, it is based on the trial court's review of the pre-existing record, supplemented with affidavits. On appeal, Ms. Trout claims that she had a right to "[a]ttend any hearing," and that the failure to grant a continuance so that she could attend violates this right. Tenn. Code Ann. § 34-3-106(4). However, the trial court was not required, by court rule or otherwise, to conduct a hearing on the Rule 59 motion at all. *See Jerkins v. McKinney*, 533 S.W.2d 275, 279 (Tenn. 1976). The purpose of a Rule 59 motion "is to provide the trial court with an opportunity to correct errors before the judgment becomes final." *In re M.L.D*., 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005) (citing *Bradley v. McLeod*, 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998)). "The motion should be granted when the controlling law changes before the judgment becomes final; when previously unavailable evidence becomes available; or to correct a clear error of law or to prevent injustice." *Id.* In this case, there was no indication that new evidence had become available that would require the trial court to alter its decision. Rather, counsel for Ms. Trout simply informed the trial court that he anticipated calling "Ms. Trout to testify as to certain issues for the Court's consideration," without elaborating on why her testimony was necessary. Counsel for Ms. Trout was present at the hearing, and he fully represented her interests with respect to the Rule 59 motion. We conclude that the trial court did not err in denying Ms. Trout's request for a continuance of the hearing on her Rule 59 motion.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Lila M. Trout and her surety, for which execution may issue, if necessary

_____
HOLLY M. KIRBY, JUDGE