IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 14, 2024 Session

**MARY MCCABE PEIRCE v. LEE WESSON HOPE**

**Appeal from the Circuit Court for Shelby County
No. CT-0819-21     Gina C. Higgins, Judge**

_____

**No. W2023-00621-COA-R3-CV**
_____

This is a grandparent visitation case brought by the maternal grandmother of the child at issue. When the trial court dismissed the grandmother's petition following a trial, it held, among other things, that there was no danger of substantial harm to the child in the absence of visitation. Although the trial court ruled in favor of the child's father on the merits of the underlying case, it ultimately rejected the father's request to recover attorney's fees for his defense of the lawsuit. For the reasons stated herein, we affirm the trial court's dismissal of the grandmother's petition and also affirm the trial court's denial of attorney's fees to the father.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Lara E. Butler and Elizabeth W. Fyke, Memphis, Tennessee, for the appellant, Mary McCabe Peirce.

Lucie K. Brackin, S. Suzanne Brown, and G. Hite McLean, III, Memphis, Tennessee, for the appellee, Lee Wesson Hope.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

The Appellant in this appeal, Mary McCabe Peirce ("Grandmother"), is the maternal grandmother of the child at issue. The Appellee, Lee Wesson Hope ("Father"), is the child's father. According to the record, the child's mother was estranged from Grandmother as of the time of trial and also did not have a presence in the child's life as of

that time. The record reflects that the child's mother has a history of substance abuse.

Father was previously married to the child's mother, and in the early years of the child's life, the child, her mother, and Father lived in Florida, less than a mile away from Grandmother. Grandmother, who considered herself to be an active grandmother, testified that she saw the child "maybe two or three [times a week]" from the time of the child's birth in December 2009 until Father and the child's mother separated in late October 2011. Father has not disputed that Grandmother saw the child on a weekly basis during these early years of the child's life; in fact, per his testimony, Grandmother came over to the marital home "[m]aybe once or twice a week" prior to his separation from the child's mother.

Following Father's separation from the child's mother in October 2011, the child's mother moved out of the marital residence and onto Grandmother's property. According to Grandmother's description of the living arrangement, the child's mother lived in an attached "guest quarters" that had no kitchen, meaning that she was in Grandmother's house "[e]very day for most of the time." When describing the living situation further, Grandmother stated as follows: "They lived, if you went outside my side door and took three steps one way and three steps another way there was a guest quarters. It had two bedrooms and a study." Of note, although the child also stayed in these guest quarters at times with her mother, the child did not live there exclusively during the pendency of her parents' separation. The child also was with Father at times. Per Father's trial testimony, the respective parenting time that the child's mother and he had, in terms of percentages, was "60-40."

The child's mother would later vacate Grandmother's property after having lived there for well over a year, and in November 2013, she and Father were divorced. Grandmother still continued to see the child, albeit with less frequency than during the period of separation between Father and the child's mother. According to Grandmother's testimony, she saw the child weekly when she was in town, and all of her time with the child occurred through her daughter, not Father. Grandmother eventually became estranged from the child's mother, and according to her testimony, this estrangement actually occurred before the child's mother became involved with drugs.

According to Grandmother, she thinks she saw the child for the last time in July 2018. Later that same year, in September 2018, Father obtained emergency custody of the child.

Following the last time that Grandmother believes she saw the child, which was July 2018, and throughout the immediate months after Father obtained emergency custody of the child, Grandmother did not contact Father in an attempt to see the child. She would later reach out to Father, however, through a series of text messages, beginning with one sent on June 18, 2019. In response to Grandmother's June 18, 2019, message, Father

replied that he was "open" to letting the child see Grandmother, but he further stated that he first required Grandmother to meet with him and a therapist to discuss how to, among other things, address questions Father believed the child was "likely to ask . . . about her mother."

It does not appear to be disputed that, in the ensuing meeting with this therapist, Father confronted Grandmother about the situation surrounding the child's mother and expressed a desire for Grandmother to appear and testify at an upcoming court hearing. As it turns out, Grandmother did not appear at the referenced hearing, which concerned Father's proposed parental relocation. According to Father's testimony, Grandmother had ignored a subpoena to appear at the hearing. Incidentally, a couple of days prior to the hearing, the child's mother had agreed to let Father permanently relocate with the child to Memphis, Tennessee. When asked at the trial of this matter why he had still wanted testimony if the child's mother had already agreed to allow him to relocate, Father responded in part as follows: "[W]e still have to have a hearing because in Florida the judge wants to hear it directly from the mother that she is signing away her child."

When Grandmother later reached out again about potentially seeing the child, Father brought up Grandmother's absence at the prior court hearing and further stated that Grandmother had made the wrong choice and that her decision "will reverberate for the next 9 years and beyond." Although Father also directed Grandmother to provide dates she would be available if she wished to sit down for another meeting with the therapist, it appears that Grandmother's subsequent response to Father's message, as well as additional texts from her to him, were ignored. Father and the child relocated from Florida to Memphis in the spring of 2020.

In addition to contacting Father, Grandmother also sent letters to the child. Father claimed at trial that he gave the child all of the letters with the exception of two, regarding which, Father noted, Grandmother "had spelled [the child's] name wrong two different ways on the envelopes."[1] On one occasion, the child wrote back to Grandmother in a small notebook, and at trial, photographs of the child's correspondence to Grandmother were introduced as an exhibit. According to Grandmother, based on her reading of the letter, the child "sounded happy, well-adjusted."

Grandmother initiated the present litigation seeking grandparent visitation in March 2021, and the underlying trial took place over two separate dates in the spring of the following year. Subsequently, in March 2023, the trial court entered an order dismissing Grandmother's petition. In pertinent part, the trial court found, among other things, that there was "no danger that substantial harm may or will result to the minor Child should

---

[1] Grandmother took photographs of the letters prior to sending them. When shown a couple of the envelopes at trial, Grandmother acknowledged that she had spelled the child's name incorrectly, saying she "must have been in a rush."

there be no court ordered visitation." In a later order, the trial court rejected Father's ability to recover attorney's fees in defense of Grandmother's lawsuit.

Now that the present appeal is pending before this Court, both parties seek relief. Whereas Grandmother's issue on appeal generally poses the question of whether the trial court erred in dismissing her petition for grandparent visitation, Father's raised issue asks whether the trial court erred in denying his request for attorney's fees and whether he is entitled to attorney's fees on appeal. We will address the grievances of both parties in our discussion below.

## STANDARD OF REVIEW

This case was resolved following a bench trial, and as such, we review the trial court's findings of fact "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). "[G]reat weight is given to the trial court's determinations of credibility," *Pless v. Pless*, 603 S.W.3d 753, 770 (Tenn. Ct. App. 2019), and "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Although a presumption of correctness accompanies the trial court's factual findings, the same is not true of legal issues. "[W]e review questions of law de novo with no presumption of correctness." *Sample v. Sample*, 605 S.W.3d 629, 634 (Tenn. Ct. App. 2018).

## DISCUSSION

*Legal Background and General Statutory Exposition*

A grandparent visitation case such as the present one "raises a conflict between the parent's constitutional right to make decisions about the care and custody of the child and the grandparent's right to visitation under Tennessee Code Annotated section 36-6-306." *Coleman v. Olson*, 551 S.W.3d 686, 697 (Tenn. 2018). In specifically elaborating on the nature of the constitutional rights of a parent and the circumstances under which a state may intervene in parental decision-making, the Tennessee Supreme Court has noted as follows:

> The right of a parent to raise a child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution. *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Davis v. Davis*, 842 S.W.2d 588, 598–600 (Tenn. 1992)). Parents' rights to the care and custody of their children without undue government interference is "among the oldest of the judicially

recognized liberty interests protected by the due process clauses of the federal and state constitutions." *Lovlace v. Copley*, 418 S.W.3d 1, 30 (Tenn. 2013) (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)); *see also State ex rel. Bethell v. Kilvington*, 100 Tenn. 227, 45 S.W. 433, 435 (1898) ("Ordinarily, the parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law."). Parents have a privacy interest that protects them from unwarranted state intervention in parental decision-making and prohibits the court from imposing its subjective notion of what is in the "best interests of the child." *Hawk*, 855 S.W.2d at 579–80.

Yet the state may interfere with these rights when there is a compelling state interest. *Smallwood* [*v. Mann*, 205 S.W.3d 358, 362–63 (Tenn. 2006)] (citing *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996)). The state has a role of *parens patriae* and a duty to protect minors, and the state may intervene in parental decision-making when necessary to prevent substantial harm to the child. *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983) (citing *State Dept. of Human Servs. v. Northern*, 563 S.W.2d 197 (Tenn. Ct. App. 1978)); *see also Hawk*, 855 S.W.2d at 581 (holding that "neither the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those decisions"). The substantial harm requirement protects parents from unwarranted state interference in the parenting process. *Hawk*, 855 S.W.2d at 580. Absent substantial harm to the child, a trial court lacks a sufficiently compelling justification for interfering with the parents' privacy rights by ordering grandparent visitation. *Id.* at 582.

*Id.* at 697–98.

This "substantial harm" component has thus been described as the threshold question in grandparent visitation cases, *McGarity v. Jerrolds*, 429 S.W.3d 562, 570 (Tenn. Ct. App. 2013), and we have previously noted that "[t]he decisions of the U.S. Supreme Court and the Tennessee Supreme Court, interpreting the federal and state constitutions, explicitly prohibit any judicial assumption that grandparent/grandchild relationships always benefit the child, as contrary to the parents' fundamental right to raise their children as they see fit." *Green v. Evans*, No. M2011-00276-COA-R3-CV, 2012 WL 1107887, at *8 (Tenn. Ct. App. Mar. 30, 2012). As is evident below, Tennessee's grandparent visitation statute incorporates the "substantial harm" consideration as a part of the requisite analysis connected to a grandparent's pursuit of visitation rights.

Because Grandmother's concerns in the present appeal pertain to the specific manner in which the trial court addressed various parts of Tennessee's grandparent

visitation statute, which is codified at Tennessee Code Annotated section 36-6-306, we begin by quoting to the statute here to provide a point of reference for our ensuing discussion:[2]

(a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction, other courts with domestic relations jurisdiction or juvenile court in matters involving children born out of wedlock of the county in which the petitioned child currently resides, necessitates a hearing if such grandparent visitation is opposed by the custodial parent or parents or custodian or if the grandparent visitation has been severely reduced by the custodial parent or parents or custodian:

(1) The father or mother of an unmarried minor child is deceased;

(2) The child's father or mother are divorced, legally separated, or were never married to each other;

(3) The child's father or mother has been missing for not less than six (6) months;

(4) The court of another state has ordered grandparent visitation;

(5) The child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent, parents, or custodian (this grandparent-grandchild relationship establishes a rebuttable presumption that denial of visitation may result in irreparable harm to the child); or

(6) The child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance or severe reduction of the relationship, this relationship was severed or severely reduced by the parent, parents, or custodian for reasons other than abuse or presence of a danger of substantial harm to the child, and severance or severe reduction of this relationship is likely to occasion substantial emotional harm to the child.

(b)(1) In considering a petition for grandparent visitation, the court shall first determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation or severe reduction

---

[2] Regarding the version of the statute quoted here, we have, as mentioned in the succeeding footnote, quoted to the version that was applicable at the time of the filing of Grandmother's petition.

of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:

(A) The child had such a significant existing relationship with the grandparent that loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child;

(B) The grandparent functioned as a primary caregiver such that cessation or severe reduction of the relationship could interrupt provision of the daily needs of the child and thus occasion physical or emotional harm; or

(C) The child had a significant existing relationship with the grandparent and loss or severe reduction of the relationship presents the danger of other direct and substantial harm to the child.

(2) For purposes of this section, a grandparent shall be deemed to have a significant existing relationship with a grandchild if:

(A) The child resided with the grandparent for at least six (6) consecutive months;

(B) The grandparent was a full-time caretaker of the child for a period of not less than six (6) consecutive months; or

(C) The grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year.

(3) A grandparent is not required to present the testimony or affidavit of an expert witness in order to establish a significant existing relationship with a grandchild or that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child. Instead, the court shall consider whether the facts of the particular case would lead a reasonable person to believe that there is a significant existing relationship between the grandparent and grandchild or that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child.

(4) For the purposes of this section, if the child's parent is deceased and the grandparent seeking visitation is the parent of that deceased parent, there shall be a rebuttable presumption of substantial harm to the child based upon the cessation or severe reduction of the relationship between the child and grandparent.

(c) Upon an initial finding of danger of substantial harm to the child, the court

shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307. Upon such determination, reasonable visitation may be ordered.[3]

(d)(1) Notwithstanding § 36-1-121, if a relative or stepparent adopts a child, this section applies.

(2) If a person other than a relative or a stepparent adopts a child, any visitation rights granted pursuant to this section before the adoption of the child shall automatically end upon such adoption.

(e) Notwithstanding any law to the contrary, as used in this part, with regard to the petitioned child, the word "grandparent" includes, but is not limited to:

(1) A biological grandparent;

(2) The spouse of a biological grandparent;

(3) A parent of an adoptive parent; or

(4) A biological or adoptive great-grandparent or the spouse thereof.

(f) For purposes of this section, "severe reduction" or "severely reduced" means reduction to no contact or token visitation as defined in § 36-1-102.

Tenn. Code Ann. § 36-6-306.

The requisite analysis under the statute, which has been described by commentators as both "lengthy and complex," Marlene Eskind Moses & Jessica J. Uitto, *The Current Status of Tennessee's Grandparent Visitation Law*, 46 Tenn. B.J. 24 (Jan. 2010),[4] has also

---

[3] Although we have quoted herein to the version of the statute applicable at the time of the filing of Grandmother's petition, we note that the statute has been slightly amended during the pendency of this appeal. The current version of section 36-6-306(c) reads as follows:

Upon an initial finding of danger of substantial harm to the child, the court must then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307. Upon such determination, reasonable visitation may be ordered. Reasonable visitation must constitute, at a minimum, sufficient contact to reasonably permit a strong and meaningful relationship to be established with the child.

Tenn. Code Ann. § 36-6-306(c).

[4] Although the specific content of the statute has been amended in some respects since this characterization, the description still fairly holds.

been variously referred to as involving a three-pronged analysis, *id.*, or as containing four elements that grandparents must prove to establish court-ordered visitation. *Beltz v. Heffner*, No. E2018-01962-COA-R3-CV, 2019 WL 5607467, at \*2 (Tenn. Ct. App. Oct. 30, 2019). Regardless of how the dictates of the statute are combined or classified in numerical terms, we note that the statute initially demands that a grandparent prove not only that "grandparent visitation is opposed by the custodial parent or parents or custodian" or that "grandparent visitation has been severely reduced by the custodial parent or parents or custodian," Tenn. Code Ann. § 36-6-306(a), but also that one of the six situations in Tennessee Code Annotated section 36-6-306(a) exist. *See id.* As is relevant to the present case, we note that one of these six situations is implicated when "**[t]he child's father or mother are divorced**, legally separated, or were never married to each other[.]" Tenn. Code Ann. § 36-6-306(a)(2) (emphasis added).

As mentioned earlier in this Opinion, the statute also demands a consideration of harm as a prerequisite to granting grandparent visitation. Of note, however, the particular manner in which the harm consideration is litigated in a given grandparent visitation case could vary depending upon the underlying facts. For instance, although not relevant to the facts at issue here, the statute provides that, "if the child's parent is deceased and the grandparent seeking visitation is the parent of that deceased parent, there shall be a rebuttable presumption of substantial harm to the child based upon the cessation or severe reduction of the relationship between the child and grandparent." Tenn. Code Ann. § 36-6-306(b)(4). Another rebuttable presumption pertaining to the question of harm is contained in, incidentally, one of the six listed circumstances found in Tennessee Code Annotated section 36-6-306(a). That particular presumption, which is of much dispute in the present litigation, provides that, if "[t]he child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent, parents, or custodian," such a "grandparent-grandchild relationship establishes a rebuttable presumption that denial of visitation may result in irreparable harm to the child[.]" Tenn. Code Ann. § 36-6-306(a)(5). Of course, although the litigation of the harm element in grandparent visitation cases may occur within the framework of the above rebuttable presumptions, these presumptions are not always available to a party. Indeed, in other cases, it is incumbent upon grandparents to affirmatively prove, in the first instance, "the presence of a danger of substantial harm to the child." Tenn. Code Ann. § 36-6-306(b)(1); *see also McGarity*, 429 S.W.3d at 571 & n.4 (noting that proof of such harm is a threshold requirement under the statute in "most cases" but stating that petitioning grandparents "are not required to affirmatively prove substantial harm" when the rebuttable presumptions in the statute are implicated). As for what actually constitutes harm in this context, this Court has acknowledged that "[t]he term 'substantial harm' does not lend itself to easy definition." *McGarity*, 429 S.W.3d at 573. When generally discussing this in a prior opinion, we attributed such a difficulty in definition to "the variability of human conduct." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). Nonetheless, we have noted that "the use of the modifier 'substantial' indicates two things." *Id.* As we noted:

- 9 -

First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Id.* (internal footnote omitted).

The requisite analysis under the statute does not end upon a finding of substantial harm. Indeed, "[u]pon an initial finding of danger of substantial harm to the child, the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307." Tenn. Code Ann. § 36-6-306(c). Then, "[u]pon such determination [regarding best interests], reasonable visitation may be ordered." *Id.*

*Assessing the Trial Court's Dismissal of Grandmother's Petition*

There is no dispute in this case as to whether Grandmother satisfied the dictates of Tennessee Code Annotated section 36-6-306(a) so as to necessitate a hearing according to the statute's terms. *See* Tenn. Code Ann. § 36-6-306(a) ("Any of the following circumstances . . . necessitates a hearing if such grandparent visitation is opposed by the custodial parent . . . or if the grandparent visitation has been severely reduced by the custodial parent[.]"). Indeed, Father does not dispute that he opposed visitation, and he also concedes that he and the child's mother are divorced. *See* Tenn. Code Ann. § 36-6-306(a)(2). Grandmother, however, criticizes the following passage from the trial court's order that appears after acknowledgments by the trial court that "the parents were divorced" and that Father had opposed visitation:

Next, Grandmother has to prove that the Child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent, . . . or the child and the grandparent maintained a significant existing relationship for a period of twelve (12) months or more immediately preceding severance or severe reduction of the relationship, . . . and severance or severe reduction of this relationship is likely to occasion substantial emotional harm to the child.

Grandmother argues that the trial court "should have proceeded" to an analysis of substantial harm under Tennessee Code Annotated section 36-6-306(b). Specifically, Grandmother submits that the trial court misstated her next element of proof by considering, as the foregoing passage from the court contemplates, whether the circumstances in either Tennessee Code Annotated section 36-6-306(a)(5) or section 36-6-306(a)(6) have been established. Admittedly, the trial court's language in the foregoing passage lacks some precision to the extent that the "Next, Grandmother has to prove"

- 10 -

phrasing suggests, in a vacuum, that Grandmother is somehow obligated to prove the circumstances in either Tennessee Code Annotated section 36-6-306(a)(5) or section 36-6-306(a)(6) notwithstanding her prior establishment of Father's opposition to visitation and the divorce of the child's parents under section 36-6-306(a)(2). Grandmother is undoubtedly correct that she is not required to prove additional circumstances outside of Tennessee Code Annotated section 36-6-306(a)(2) in order to prevail in this case, but whereas the trial court's specific phrasing in the foregoing passage is not a model of clarity, the larger context of the order clearly indicates that the trial court did not actually demand proof of additional circumstances under Tennessee Code Annotated section 36-6-306(a)(5) or section 36-6-306(a)(6). Indeed, consider the following excerpt from the trial court's order that immediately follows the passage quoted above:

> Grandmother must prove that **one of** the applicable factors set forth under Tenn. Code Ann. § 36-6-306(a)(1)-(6) exists. Again, it is undisputed by the Parties that the factual basis for (a)(2) exists in this case. The minor Child's parents were divorced on November 13, 2013, however, it is disputed by the Parties that the factual basis for (a)(5) or (a)(6) exist in this case. The Court finds (a)(2) applicable to this Petition but not (a)(5) or (a)(6).
>
> . . . .
>
> The next issue is whether there is danger of substantial harm to the minor Child absent a grant of visitation rights.

(emphasis added).

A more comprehensive examination of the order thus shows that the trial court did, in fact, proceed to an analysis of substantial harm notwithstanding its determination that neither Tennessee Code Annotated section 36-6-306(a)(5) nor section 36-6-306(a)(6) had been established. Indeed, in the final analysis of the order, it is apparent that the trial court did not actually condition Grandmother's right to relief on establishing either Tennessee Code Annotated section 36-6-306(a)(5) or section 36-6-306(a)(6) on top of her acknowledged establishment of Tennessee Code Annotated section 36-6-306(a)(2).

In addition, despite the lack of clarity in places, the larger context of the trial court's order suggests that Tennessee Code Annotated section 36-6-306(a)(5) was itself specifically considered, as is appropriate, in order to evaluate whether Grandmother was entitled to the rebuttable presumption contained in that Code provision. Grandmother's own position on appeal does not eschew reliance on the rebuttable presumption available under Tennessee Code Annotated section 36-6-306(a)(5), as she actually argues that the trial court "should have" considered it established.

In light of the foregoing, notwithstanding what the specifically quoted "Next,

Grandmother has to prove" language appears to suggest in immediate view of the court's prior recognition that Tennessee Code Annotated section 36-6-306(a)(2) had been established, our overview of the larger context of the order should dispel any suggestion that the trial court foreclosed an examination into the harm question because of its finding that circumstances under Tennessee Code Annotated section 36-6-306(a)(5) and section 36-6-306(a)(6) were absent. Moreover, as noted, Grandmother clearly wanted the trial court to entertain whether circumstances had been established under Tennessee Code Annotated section 36-6-306(a)(5) for purposes of establishing a rebuttable presumption of harm in this case.

As noted earlier, the provision in Tennessee Code Annotated section 36-6-306(a)(5) itself exists among the six statutory circumstances that can necessitate a hearing for grandparent visitation pursuant to the authority of Tennessee Code Annotated section 36-6-306(a). In also providing for the rebuttable presumption of harm relied upon in this case by Grandmother, the text of the provision reads as follows:

> The child resided in the home of the grandparent for a period of twelve (12) months or more and was subsequently removed from the home by the parent, parents, or custodian (this grandparent-grandchild relationship establishes a rebuttable presumption that denial of visitation may result in irreparable harm to the child)[.]

Tenn. Code Ann. § 36-6-306(a)(5).

In its order, the trial court appeared to reject the availability of this rebuttable presumption of harm on two fronts. On one front, the trial court appeared to reject the availability of the provision due to the supposed absence of facts that the child resided "in the home" of Grandmother. *Id.* On a second front, the trial court appeared to reject the availability of the provision due to lack of proof that would satisfy the statute's temporal component, i.e., that the child "resided in the home of the grandparent **for a period of twelve (12) months or more**." *Id.* (emphasis added).

We need not tax the length of this Opinion by definitively considering whether the trial court's conclusion in relation to Tennessee Code Annotated section 36-6-306(a)(5), or all of the ancillary findings connected thereto, should withstand appellate scrutiny. We pretermit any definitive assessment of such matters because, even assuming arguendo that Grandmother was entitled to a presumption of harm in this case under section 36-6-306(a)(5), Father clearly rebutted the notion that there is a danger of irreparable or substantial harm resulting from an absence of visitation between the child and Grandmother. In this vein, we note that the trial court's own order contains ample findings that themselves serve to rebut the presumption that section 36-6-306(a)(5) creates.

For instance, the trial court noted that "[t]he uncontroverted proof adduced from the

testimony of Father, the witnesses, and even Grandmother, is that the Child is happy and well-adjusted living in Memphis with Father and the life they have established." Further, the trial court stated that "based upon the testimony of the witnesses and the proof adduced at trial . . . there is no danger that substantial harm may or will result to the minor Child should there be no court ordered visitation."

As for the proof that supports such conclusions, and which clearly works to rebut any presumption of harm, we initially note that, although there is no question that Grandmother was a frequent presence in the child's life up until the summer of 2018, she last saw the child per her testimony in July 2018. Father was awarded emergency custody of the child the following fall in September 2018, and eventually, many months thereafter in June 2019, Grandmother reached out to Father about potentially seeing the child. Concerning the time since, the case has not been marked by any evidence that the child's disposition or personality has changed negatively as a result of not seeing Grandmother. To the contrary, as discussed below, there is affirmative evidence that the child is doing well.

When Grandmother was asked on cross-examination about whether the letter that the child had sent to her gave her any concern about the child's emotional well-being, Grandmother responded, as noted earlier, that the child "sounded happy, well-adjusted." Continuing on, Grandmother testified as follows: "She sounded like she missed me, but, you know, she was telling me what she was doing every day, what she wanted to share with me. She sounded well-adjusted. **She's fine**." (emphasis added). That the child, as Grandmother put it, "sounded happy," certainly resonates through the letter, and in this regard, we specifically note that much of the writing by the child in the letter appears to convey an animated, excited tone through the child's frequent use of exclamation marks.

Aside from Grandmother's testimony referenced above that the child "sounded happy" and was "fine," the trial court heard additional testimony from other witnesses who testified concerning the child and her well-being. One witness called by Father, Ellison Bakelaar, who stated that her daughter was "best friends" with the child, described her as "very mature," "very well adjusted," and "[v]ery happy." In expounding upon this last point, Ms. Bakelaar stated as follows: "She's always -- big, big smiles. She's . . . very charismatic, great sense of humor. Like I said, she's just always -- I've never -- I've never seen her in a bad mood." According to Ms. Bakelaar, she also had never seen the child give any indication that she was in distress. Another witness, Treat Macdonald, who also knew Father and the child, testified that he had known the child for "[t]hree years or so" and described her as "very bright, wicked sense of humor, and a whole lot of fun." According to his testimony, the child had never indicated to him that she was in distress, and he claimed he had never heard the child mention the name "Mary Peirce" and also had no recollection of the child ever mentioning her "grandmother." As for Father's testimony, he claimed that the child never got upset after receiving any letters or cards from Grandmother, and when he was asked if the child had, at any time since September 2018,

- 13 -

gotten upset about not seeing her grandmother, Father responded in the negative. Father also testified that the child did not get upset when writing the letter that was sent to Grandmother.

As should be evident, a common thread runs through all of this evidence. Even per Grandmother's account, the child appeared to be happy and well-adjusted, and in our view, the ultimate disposition by the trial court in this case was clearly the correct one. This remains true irrespective of whether the rebuttable presumption of harm relied upon by Grandmother should have been considered to be available to her. Indeed, as we stated earlier, even assuming arguendo that Grandmother was entitled to a presumption of harm in this case, Father's proof clearly rebutted the notion that there is a danger of irreparable or substantial harm resulting from an absence of visitation between the child and Grandmother. In light of our conclusion on this matter, we hereby affirm the trial court's dismissal of Grandmother's petition for grandparent visitation. In concluding our review on appeal, however, an additional issue—Father's request for attorney's fees—remains to be addressed. We turn to that matter below.

*Father's Issue Concerning Attorney's Fees*

Although the trial court dismissed Grandmother's petition for grandparent visitation, it ultimately ruled that Father was not entitled to attorney's fees. The trial court acknowledged that Father was the "prevailing party" in this case, but it held that the fee provision relied upon by Father—Tennessee Code Annotated section 36-5-103(c)—"does not apply in the context of grandparent visitation actions to allow a biological parent to recover attorney fees from a grandparent."

Father asserts that the trial court erred in denying his request for fees and also submits that we should award him appellate attorney's fees. In response, Grandmother argues that the trial court committed no error on the subject of fees and states that the "legislature chose not to include the right to recover attorney fees in the current grandparent visitation statute," while also citing to this Court's past decision in *Kiihnl v. Kiihnl*, No. 02A01-9111-CV-00286, 1992 WL 357188, at *5 (Tenn. Ct. App. Dec. 4, 1992), wherein we observed that the "legislature did not make a like provision [to Tennessee Code Annotated section 36-5-103(c)] when it enacted the grandparent visitation statute."

In support of his position that the trial court erred in denying him attorney's fees, Father suggests that this case "closely parallels" the Tennessee Supreme Court's decision in *Toms v. Toms*, 98 S.W.3d 140 (Tenn. 2003). *Toms* involved an extraordinary appeal under Rule 10 of the Tennessee Rules of Appellate Procedure stemming from a trial court's grant of temporary custody of children to their paternal grandparents during the pendency of an underlying divorce action. *Id.* at 141. In addition to reversing the trial court's award of temporary custody to the grandparents, the Supreme Court remanded for an assessment of attorney's fees against the grandparents pursuant to a request by the children's mother

for attorney's fees under Tennessee Code Annotated section 36-5-103(c). *Id.* at 145–46. In explaining why attorney's fees were recoverable, the Supreme Court quoted to the statute's language and then stated as follows:

> From this language, it is clear that the *spouse* to whom custody is awarded may recover attorney's fees from the other *spouse.* It is also clear that a third person to whom custody is awarded may recover attorney's fees. In this case, however, the spouse having custody is seeking to recover attorney's fees from a third party intervenor seeking custody. We conclude that the statutory language supports such an award of attorney's fees.
>
> Grandparents were made parties to the divorce action as a result of their request to intervene. The trial court awarded Grandparents temporary custody of the children. Had Grandparents prevailed in this Court, they would have been entitled to recover attorney's fees from Mother, Father, or both under Tennessee Code Annotated section 36–5–103(c). *See D v. K,* 917 S.W.2d 682, 686 (Tenn.Ct.App.1995) (construing Tennessee Code Annotated section 36–5–103(c) to allow for fees on appeal). We conclude that parties to whom attorney's fees may be awarded pursuant to this statute may also have attorney's fees awarded against them when their petition is unsuccessful.

*Id.* at 145.

Father's reliance on *Toms* is misplaced. As evidenced from the above discussion, *Toms*, unlike the present case, involved a matter of custody. There is no question that the statute applies to, among other situations, actions concerning custody:

> (c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Tenn. Code Ann. § 36-5-103(c). The statute does not, however, provide for an award of attorney's fees in the context of a grandparent visitation case, and inasmuch as Tennessee adheres to the American Rule, we cannot countenance Father's position on fees. As the Tennessee Supreme Court has instructed:

> Under the American rule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover

- 15 -

attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case.

*Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009).

Although Father endeavors to shoehorn this case under the reach of the statute and characterizes Grandmother's petition as a "challenge to the existing custody Order," we note that in a relatively recent appeal, which arose from an action for grandparent visitation, this Court stated that it was "unaware of any contract, statute, or recognized exception that would provide [a basis for an award of attorney's fees to the grandmother therein]." *In re Diawn B.*, No. M2017-01159-COA-R3-JV, 2018 WL 3530838, at *6 (Tenn. Ct. App. July 23, 2018). In light of the foregoing, we hereby respectfully deny Father any relief concerning this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is hereby affirmed.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE